LYLE S. HOSODA            3964-0
KOURTNEY H. WONG          10827-0
SPENCER J. LAU            11105-0
HOSODA LAW GROUP, AAL, ALC
Three Waterfront Plaza, Suite 499
500 Ala Moana Boulevard
Honolulu, Hawai'i 96813
Telephone:   (808) 524-3700
Facsimile:   (808) 524-3838
Email: lsh@hosodalaw.com
khw@hosodalaw.com; sjl@hosodalaw.com


KRISTINA S. BAEHR        *Pro Hac Vice (pending)*
JAMES BAEHR              *Pro Hac Vice (pending)*
MARY M. NEUSEL           *Pro Hac Vice (pending)*
JUST WELL LAW, PLLC
2606 W 8th St, Unit 2
Austin, TX 78703
Telephone: (512) 693-8029
Email: kristina@well.law; jim@well.law; maggie@well.law


FREDERICK C. BAKER       *Pro Hac Vice (pending)*
JAMES W. LEDLIE          *Pro Hac Vice (pending)*
KRISTEN HERMIZ           *Pro Hac Vice (pending)*
CYNTHIA A. SOLOMON       *Pro Hac Vice (pending)*
SARA O. COUCH            *Pro Hac Vice (pending)*
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: fbaker@motleyrice.com; jledlie@motleyrice.com;
khermiz@motleyrice.com; csolomon@motleyrice.com;
scouch@motleyrice.com


*Attorneys for Plaintiffs*

*(case caption continued on next page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| Jaclyn Hughes, et al.[1]; | CIVIL NO. 1:24-cv-00059 |
| | (FEDERAL TORT CLAIMS ACT) |
| Plaintiffs, | |
| vs. | |
| | COMPLAINT |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

---

[1] A full list of the 2,212 plaintiffs filing this lawsuit are listed in Attachment A. There are thousands of additional Red Hill claimants in the administrative process of the Federal Tort Claims Act. The negligence of the United States and the nuisance it created harmed thousands through water contamination at Red Hill. Their claims will be added to this lawsuit for adjudication as soon as possible.

## COMPLAINT

When she thinks about then four-year-old K.H. Hughes, how her once vivacious spirit turned into a whirl of confusion and rage, her older sister wishes she could have taken upon herself what the water did to her younger sister. She knows it was same water that showed in a sheen on their faucets and left their home smelling of gasoline, the water that forced her family into a hotel and kept her parents separated, and that saw her mother, Jaclyn, brave the weight of countless jugs until she suffered a physical ailment common in lands less fortunate. She knows it was the water that changed K.H. into an unrecognizable child, it was the water that changed their lives forever, and when she thinks about it, she can't help but cry.

It's the same water that left previously healthy C.C. Crawford with gastrointestinal issues that have persisted for years. It's the same water that left veteran Anthony Hewitt with a tremor in his hand. It's the same water that forced the native Hawaiian Delgado family to leave the island they had always called home to finally find health care and healing elsewhere.

For each of these families, and the thousands in this Complaint, the water proved a poison. For each of them, the water that they relied on was negligently contaminated by jet fuel and dangerous chemicals by the Government at Red Hill.

For each of them, it did not have to be this way. For years, the Government

was warned of the danger of the jet fuel at Red Hill and the need to take due care to protect the critical water source nearby and the wells that serviced military and civilian families alike. But the Government ignored the warnings, dismissed corrective requirements, and carelessly defied the rules created to protect the water.

In May 2021, federal employees performing a fuel transfer operation in the U.S. Government's massive Red Hill fuel complex near Joint Base Pearl Harbor-Hickam decided to take a shortcut. In violation of their operations orders, the employees misaligned valves and released more than 19,000 gallons of toxic jet fuel and additives into the environment. That fuel was sucked up by an automatic sump pump system and ended up lodged in retention lines intended to contain used firefighting foam. The fuel went unaccounted for by military officials responsible for its tracking. Months later, in November 2021, a federal employee operating a train cart in the tunnels of the Red Hill facility struck a drooping hand valve of that retention line, breaking the pipe, and releasing thousands of gallons of toxic fuel into the tunnel system. Downhill from that tunnel system lay a well of a public water system that provided the water to around 93,000 people. Thousands of gallons of that toxic fuel made its way into the water system, contaminated the water, and harmed the families that relied upon the water.

Over two years after the Navy's catastrophic November 2021 release of thousands of gallons of jet fuel into the water supply around Red Hill Bulk Fuel

Storage Facility on Oʻahu, Hawaiʻi, hundreds of exposed military family members and civilians continue to voice a simple and urgent question: "Are our homes still contaminated?" A recent report from the Environmental Protection Agency indicates petroleum hydrocarbons remain in the system and raises enduring concerns about inadequate remediation of premises plumbing and the water distribution system.

The Government owned all of the premises: the Red Hill Bulk Fuel Storage Facility, the water system, and the land on which the Plaintiffs lived. The Government knew it had spilled the fuel in May but failed to warn anybody of potential contamination. The Government knew it released fuel again in November but told residents that "there was no indication the water is not safe to drink." A lessor has a duty to warn a lessee of dangerous conditions that are known to the lessor but not known or obvious to the lessee – even when the dangerous condition exists in an area not controlled by the lessor. The Government knew that it had a duty to disclose the *risk* of water contamination immediately to protect the community.

But the truth as to what happened at Red Hill in 2021 is indisputable. Before, during, and after the contamination, as more than 93,000 military service members, their family members, and civilians relied on the Government for safe water on the island of Oʻahu, the Navy harbored toxic secrets. As these families

iv

would only belatedly discover, the water they drank and bathed in was dangerously contaminated. And Government officials knew all along. The Government failed to disclose the relationship of the water contamination to the November jet fuel release for *twelve days*—holding town halls to reassure residents that their water was safe to use, or their area was unaffected, while thousands of people went to the emergency room with acute poisoning symptoms.

The Government then did not test the water in residents' homes for total petroleum hydrocarbons and destroyed water sample vials collected from over one thousand family homes. Water samples that could have revealed the chemicals present in these family's waters—for health and for accountability—were trashed instead. While the Government later disclosed the exposure of jet fuel, the Government failed to disclose the other additives that infiltrated the water source during the release and cleanup thereafter.

Hundreds of military family members and civilians continue to suffer from a wide range of frightening, debilitating health effects of toxic exposure over two years later, while the Navy's reluctant, inconsistent delivery of medical care to the injured, its secrecy, and its minimization of their experiences has left many of them fearing for their families and futures.

The Federal Tort Claims Act offers a legal remedy. Those who have been harmed by the negligence of the United States are entitled to compensation for the

harm. And, indeed, this case is what the Federal Tort Claims Act was designed for.

TABLE OF CONTENTS

**NATURE OF THE CASE** ...................................................................1

**PARTIES** ............................................................................................1

**FACTUAL BACKGROUND** ............................................................2

A. *On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000-gallon fuel leak into the fire suppression system at Red Hill.* ........4

B. *On November 20, 2021, a federal officer operating a train cart struck and broke a pipe valve that erupted in a release that resulted in thousands of gallons of fuel getting into the Red Hill water system.* .................................7

C. *The Safe Drinking Water Act and EPA regulations required the Navy to warn.* ...........................................................................................................13

D. *After the release, the Navy failed to warn residents of the danger.* .............16

E. *The Navy did not announce the leak's impact on the water until December 2, 2021— twelve days after the release.* .......................................................20

F. *The Navy took responsibility for the release but not for its failure to warn.* 21

G. *The Navy knew it was not safely operating the Red Hill fuel tank system...* 22

H. *The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm.* ......................................24

I. *Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused.* ..........................31

J. *After litigation began, reports emerged that the Navy discarded critical evidence that would have revealed the extent of the harm they caused.* .......33

K. *Additional leaks of dangerous substances from the Red Hill facility raise additional questions as to contaminants in the water from the fuel leak.* ....36

L. *The Navy's operations at Red Hill likely violated additional regulations...* 37

*M.  Affected families have suffered extraordinary, compensable harm.*............40

    a.    The Hughes Family ........................................................................44

    b.    The Crawford Family .....................................................................46

    c.    The Delgado Family........................................................................48

    d.    The Hewitt Family..........................................................................51

    e.    The Long Family .............................................................................54

    f.    The McCart Family .........................................................................55

    g.    The Wilson Family ..........................................................................57

**CAUSES OF ACTION** ................................................................................**60**

COUNT I: NEGLIGENCE........................................................................60

COUNT II: NEGLIGENT UNDERTAKING ................................................62

COUNT III: NUISANCE........................................................................68

COUNT IV: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE ..........70

COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ............................72

COUNT VI: PREMISES LIABILITY, DUTY TO CONTROL FORCE.............................73

**CAUSATION**....................................................................................**77**

**NO EXCEPTIONS APPLY** ........................................................................**79**

**JURISDICTION, VENUE & SERVICE** .......................................................**79**

**LIABILITY OF THE UNITED STATES** ......................................................**80**

**CONDITIONS PRECEDENT** .....................................................................**81**

**DAMAGES** ..........................................................................................**82**

**PRAYER** ............................................................................................**83**

This case arises out of the negligence by the United States of America and its agencies that caused the contamination of the water supply with jet fuel and other contaminants at Red Hill, Hawaiʻi from jet releases on May 6 and November 20, 2021, failed to warn, failed to remediate, and failed to provide appropriate treatment thereafter.

The Plaintiffs bring this Complaint under the Federal Torts Claims Act, 28 U.S.C. § 2674.

NATURE OF THE CASE

1.      This complaint is filed pursuant to the provisions of the Federal Tort Claims Act, Title 28, U.S.C §§ 1346(b), 2671, *et seq.*, against the United States of America for negligence, negligent undertaking, nuisance, medical malpractice, negligent infliction of emotional distress, and premises liability resulting in physical and emotional injuries where the Government of the United States of America, if a private party, would be liable to the Plaintiffs.

PARTIES

2.      Each of the Plaintiffs ingested water provided by the Red Hill shaft that was owned and operated by the United States Department of the Navy during the time frame of the acts or omissions alleged herein.

3.      Defendant is the United States of America.

1

FACTUAL BACKGROUND

4.    On at least two separate occasions, on May 6 and November 20, 2021, Government personnel at Red Hill Bulk Fuel Storage Facility (Red Hill Facility) made negligent errors that resulted in the release of thousands of gallons of jet fuel and other contaminants into the drinking water of families on the Navy water line on the island of Oʻahu. Because Government personnel then failed to disclose those leaks as required, the Plaintiffs continued to ingest jet fuel and became sick from that exposure. Instead of promptly and appropriately addressing the harm, Government officials conducted a woefully inadequate clean-up and clearing effort, while Government doctors provided medical care far below the standard of care. The Plaintiffs continue to suffer from severe illness, inconvenience, and fear.

5.    The needless and foreseeable releases at the Red Hill Facility were caused by a specific series of negligent actions by federal officers. Congress foresaw and passed laws to avoid precisely this harm, and the Navy is and was bound by specific statutes, regulations, orders, and decrees that were ignored or violated. These statutes, regulations, orders, and decrees also constituted undertakings by Congress and the agencies, negligently conducted. The specific nature and extent of those violations will be further delineated through jurisdictional discovery.

6.    The Navy owns and operates the Red Hill Facility on the island of

Oʻahu, Hawaiʻi to maintain strategic fuel reserves in the Pacific. The facility has been operational since 1943 and consists of 20 steel-lined tanks that measure 100 feet in diameter and 250 feet high and can hold 12.5 million gallons of fuel each. Altogether, these underground storage tanks can store up to 250 million gallons of fuel. The tanks are connected to three pipelines that run 2.5 miles through a concrete tunnel to fueling piers at Pearl Harbor.

7.      The Red Hill Facility currently stores and dispenses at least three types of fuels – necessary for powering military assets but toxic if imbibed by humans. Fuels currently stored in the tanks include marine diesel for ships and two types of jet fuel, Jet Propellant-5 (JP-5) and Jet Propellant-8 (JP-8). "Chemicals of concern" in these fuels include "total petroleum hydrocarbons (TPH), benzene, toluene, ethylbenzene, xylenes, naphthalene, and methylnaphthalenes" according to the Environmental Protection Agency (EPA). These fuels also contain extensive additives.

8.      EPA Region 9 is responsible for monitoring the Red Hill Facility and ensuring compliance with all federal water regulations.

9.      The Navy also owns and operates a water system that pumps water from underground aquifers to provide drinking water to the military community and facilities associated with Joint Base Pearl Harbor-Hickam (JBPHH), including military housing that is run as a public-private venture on Government-owned

3

land. Three wells supply the Navy's drinking water system: the Red Hill Shaft,

Navy Aiea-Halawa Shaft, and Waiawa Shaft.

10.     The Red Hill Facility sits 100 feet above an aquifer that supplies

drinking water to approximately 763,000 Oʻahu residents, according to the EPA.

**A. On May 6, 2021, the negligent "operator error" of a federal officer caused a 19,000-gallon fuel leak into the fire suppression system at Red Hill.**

11.     On May 6, 2021, a Control Room Operator and United States

Government employee at Red Hill failed to follow the required valve opening and

closing sequence and released what the Navy then said was approximately 1,618

gallons of jet fuel. An initial command investigation determined that this failure

was due to "operator error"—a breach of the standard of care and safety protocol.

This safety violation was not discretionary and involved no weighing of policy

considerations.

12.     The Navy then claimed the majority of the fuel had been recovered

and denied that the leak contaminated any drinking water. But at a December 22,

2021, State of Hawaiʻi Department of Health (DOH) hearing, Captain James

"Gordie" Meyer, USN, Commander of the Navy Facilities Engineering Command,

revised the estimate of the amount spilled from 1,600 gallons to 19,000 gallons.

13.     The Navy identified the root cause of the May 6 incident to be a

"disregard of proper valve sequencing dictated in the specific Operations Orders,"

as well as several other factors, all of which could have been prevented by proper adherence to the rules.

14.     In an October 27, 2021, interview on Hawai'i Public Radio, Captains Meyer and Albert Hornyak, United States Navy, explained what happened with the May fuel spill. Captain Hornyak noted that, "[e]rrors on the part of the Red Hill system operator was the primary cause of the release... Specifically, the system operator not clos[ing] all of the valves as specified in the Operations Order before beginning a fuel transfer." Interview with Navy Capts. Gordie Meyer and Bert Hornyak, Hawai'i Public Radio (Jan. 12, 2022), https://tinyurl.com/MeyerHornyak, *see also* https://fb.watch/fcQOdUe319/. Both men clarified that the acts were committed by Government employees, not contractors, with Captain Meyer stating, "The 6 May event was by operators who are Government employees..." *Id.*

15.     An October 2021 Mitigations Report in the wake of the May incident prescribed corrective actions, including proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense. The operators of the Red Hill facility did not implement the corrective actions outlined in the Mitigations Report. The failure to take the required corrective actions led to devastating results a mere month later in November 2021.

16.    In the meantime, evidence mounted that the May event affected the
Plaintiffs' water. After the May 6 release event, tests at the Red Hill Shaft showed
elevated readings that exceeded environmental action levels on multiple occasions:



Exhibit D24, *Dept. of Health v. U.S. Dept. of Navy,* Dkt. No. 21-UST-EA-02 (Dec.
21, 2021).

17.    The Navy did not reveal these elevated test results to the state for
months according to state environmental health officials. Alex Horton and Karoun
Demirjian, *Military families say they were ill months before jet-fuel leak brought
scrutiny to Pearl Harbor's tap water*, WASH. POST (Dec. 21, 2021),
https://tinyurl.com/WashPostSick. "This is an early warning sign of something
going on. And yet the [health] department was not aware of it, which is a concern,"
said one such official, Felix Grange. *Id.* Following the May spill, many families

showed up at hospitals to report symptoms such as eczema, rashes, skin breakouts, stomach conditions, nausea, headaches, forgetfulness, and extreme fatigue: symptoms known to be consistent with fuel exposure. *Id.*

> **B. On November 20, 2021, a federal officer operating a train cart struck and broke a pipe valve that erupted in a blast that resulted in thousands of gallons of fuel getting into the Red Hill water system.**

18.     On November 20, 2021, a United States Government employee operating a train cart struck a fire suppression discharge pipe that contained thousands of gallons of fuel and water from the May 6 error. The damage triggered a catastrophic spill that resulted in jet fuel entering the Red Hill well, the drinking water source for the Plaintiffs.

19.     Although the Navy initially claimed that there was no video coverage of the event, a source leaked a video:



Civil Beat, *Fuel Leak at the Navy's Red Hill Facility Nov. 20, 2021,* Youtube,

https://www.youtube.com/watch?v=GEGohRlLrSA&t=3s.

20.     Admiral Samuel Paparo, USN, Commander of the U.S. Pacific Fleet,

ordered a command investigation of the incident that was endorsed by him on

January 20, 2022, and on June 6, 2022, by the Vice Chief of Naval Operations. The

report broadly confirmed the findings of the first investigation. S.J. Paparo, *First*

*Endorsement of RDML Christopher J. Cavanaugh, USN, ltr 5830 of 14 Jan 22 w/*

*encl: Command Investigation into the 6 May 2021 and 20 November 2021*

*Incidents at Red Hill Bulk Fuel Storage Facility*, (Jan. 20, 2022),

https://tinyurl.com/CavanaughReport [hereinafter Cavanaugh Report].

21.     The report confirmed the Navy's culpability under the FTCA for both

incidents. "The Navy is responsible for the 6 May 2021 and 20 November 2021

fuel spills at the Red Hill Bulk Fuel Storage Facility . . . and subsequent water contamination," the Cavanaugh Report reads. "[H]uman error was the primary cause" of both fuel spills "which led to as much as 3,322 gallons[2] of fuel contaminating the Navy drinking water system." *Id.*

22.    The human errors (negligence) were further delineated in the Findings of Fact and Opinions in the reports (emphases added):

> Finding of Fact 41: "On 6 May 2021, Red Hill operators *improperly* executed a fuel transfer procedure, resulting in two piping joint ruptures and subsequent JP-5 fuel spill. Although unknown at the time, a fire suppression system sump pump transferred most of the fuel [up to 16,999 gallons] into a retention line, where it remained until 20 November."

> Finding of Fact 174: "On 20 November 2021, the Red Hill rover *inadvertently* struck a fire suppression system retention line drain valve with the passenger cart of a train, cracking the PVC pipe near Adit 3. Although not known at the time, this retention line contained up to 16,999 gallons of JP-5 fuel from the 6 May spill. A portion of this fuel was released to the environment and ultimately entered the Red Hill well and the Navy water distribution system." Appendix C notes: "A total of 3,322 gallons of remain unaccounted for, and some or all of that fuel contaminated the Red Hill well and Navy water distribution system."

> Opinion 1: "The proximate cause of the fuel spill on 6 May 2021 was *human error*. The [Control Room Operator] and pump operator took *intentional shortcuts* when transitioning between procedures. Their improper valve operations resulted in drawing a vacuum in the JP-5 line, then rapidly pressurizing it. This pressure surge caused mechanical

---

[2] This amount was later increased to 5,542 gallons (noted as "unrecovered") in the Cavanaugh Report.

failure of two piping joints. This opinion is consistent with a root cause analysis conducted by Austin Brockenbrough and Associates, LLC, a private engineering and consulting firm."

Opinion 20. "The proximate cause of the fuel spilled from the fire suppression system retention line on 20 November 2021 was a failure to properly account for the fuel spilled on 6 May 2021 (*human error*) . . ."

Opinion 21: "The Red Hill rover *inadvertently* struck the drain valve hand wheel with the passenger cart of a train, causing the PVC pipe to crack and leak. This train is used to transit the tunnel system and likely contacted the valve hand wheel multiple times, weakening and finally cracking the pipe. FLC Pearl Harbor conducted a preliminary inquiry regarding this event, and the report postulates *excessive speed* may have caused the train to jump. The investigation team assesses it is more likely that the weight of fuel in the 14-inch diameter PVC pipe caused it to sag over time. Worn paint on the hand wheel suggests the train rubbed against it on several occasions…"

Opinion 30: "The proximate cause of contaminated drinking water was a failure to properly respond to the fuel spill on 20 November 2021 (*human error*)."

*Id.*

23.     These Findings of Fact and Opinions establish negligence and lack of due care on the part of Government personnel. The operative actions are not discretionary functions—the federal operators had no discretion to "improperly" transfer fuel by violating a required procedure or to operate a train in a manner that would "inadvertently" strike and crack pipes. There was no weighing of policy or intentional decisions here – just negligence on the part of federal employees.

24.     Moreover, the plastic material of the pipes—in defiance of military mandates for fire suppression systems—contributed to the release. The Navy

10

violated the Department of Defense requirement to use steel pipes for fuel

transmission. The Unified Facilities Criteria specifications for the Department of

Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1

. . . mandates "schedule 40 steel pipe" for such fire suppression systems like the

AFFF system at the Red Hill Facility. Department of Defense Fire Protection

Engineering for Facilities, UFC 3-60-01 (8 August 2016 as amended in 2020),

https://wbdg.org/FFC/DOD/UFC/ARCHIVES/ufc_3_600_01_2016_c5.pdf. The

weaker PVC pipes cracked under the pressure when hit by the cart—ultimately

leading to the release of tens of thousands of gallons of jet fuel.

25.     On Thanksgiving weekend, November 27-28, 2021, residents of

housing neighborhoods on the waterline began to complain to the Navy and the

DOH that their water wasn't right. They could smell fuel. They could see a sheen.

The water reacted to flames.

26.     But by November 30, ten days after the release, the Navy had still not

advised anyone on their water line that the fuel leak had affected their water source

or told them not to use the water.

27.     The Navy failed to issue a do not use notice for water system users

and held town halls to minimize the risk and deny any "indication" of petroleum

products or links to the November spill. On November 30, 2021, Rear Admiral

Kott told a town hall,

11

That leak was isolated. It was in a pipe that doesn't normally carry fuel. We recovered that fuel immediately on the Sunday afternoon, the 20th. We immediately commenced testing in addition to our weekly testing and we're waiting on those results. Those tests were taken last week. *There was no indication that made it into the well or into the drinking water.*

. . .

*Our testing has not indicated that's what the cause of this is*.

Moanalua Terrace Housing Community Town Hall at 19:14 (emphasis added), at https://www.facebook.com/JBPHH/videos/626900368338252/.

28.     Rear Admiral Blake Converse told a town a tall on December 3, 2021,

The guidance that we've provided and continue to provide for areas that have been affected is that, if you smell or taste the water, don't drink it, because we don't know what that constituent is. The answer for folks that were unaffected is that if you can't taste or smell something and your community is not affected, then *we have no indication, our samples are not showing any indication of petroleum products*.

Hickam Memorial Theater Meeting at 44:28 (emphasis added), available at https://www.facebook.com/JBPHH/videos/583003632828816/.

29.     Navy leaders also publicly dismissed complaints coming from Ford Island and Iroquois Point, and asserted these areas were entirely unaffected. Rear Admiral Converse told a virtual town hall on December 2, 2021:

[Regarding Ford Island]
So, we haven't experienced any indications of water contamination. The current guidance is not to drink the water but it's safe for bathing

and other uses. However, that's one of the things that we're going back to work with the Department of Health. Now that we've identified the specific contaminant and the source, we have more confidence that it's unlikely your drinking water is affected at all. That and with some additional samples and we think that we can restore full potable water use to Fort Island, Pearl City, Ewa and some of those outlying areas very quickly." (14:48)

[Regarding Iroquois Point]
Iroquois Point is not in the affected areas on the water main, but it is on the Navy water distribution main. So the current guidance is don't use it for drinking **but you can use it for bathing and other purposes, washing your clothes, and we're confident that pretty quickly we can get guidance that its usable for drinking as well** based on the fact that it's being provided by a good clean water source and we have no indications or no complaints in that area of contamination. We should have that as early as tomorrow" (31:16)

Navy Virtual Town Hall Meeting available at

https://www.facebook.com/JBPHH/videos/1555953844742784/.

30.     Complaints of fuel smell in the water for all of these areas were growing at the same time as these assertions. These complaints only grew over the weeks and months that followed. And detections of hydrocarbons continued in the water system throughout 2023:

### C. The Safe Drinking Water Act and EPA regulations required the Navy to warn.

31.     The Safe Drinking Water Act and EPA regulations required the Navy to issue a Tier 1 public notice within 24 hours of knowledge that the Red Hill Shaft had been contaminated with JP-5 fuel. The Government has expressly waived sovereign immunity under the Safe Drinking Water Act as an operator of a public

water system. 42 U.S.C. §§ 300f-300j (1996); SAFE DRINKING WATER ACT
AMENDMENTS OF 1996, 1996 Enacted S. 1316, 104 Enacted S. 1316 ("The
United States hereby expressly waives any immunity otherwise applicable to the
United States with respect to any such substantive or procedural requirement").

32.     40 CFR §141.201 outlines "General public notification requirements:"
"Each owner or operator of a public water system . . . *must* give notice for all
violations of national primary drinking water regulations (NPDWR). . ." A Tier 1
public notice is required for NPDWR violations and situations with significant
potential to have serious adverse effects on human health as a result of short-term
exposure, including:

> "occurrence of a . . . waterborne emergency" (such as . . . a chemical
> spill or unexpected loading of possible pathogens into the source water
> that significantly increases the potential for drinking water
> contamination.

40 CFR §141.201.

33.     The Navy was required to "[p]rovide a public notice as soon as
practical but *no later than 24 hours* after the system learn[ed] of the violation." 40
CFR §141.202(b). The Navy was required to "provide the notice within 24 hours in
a form and manner reasonably calculated to reach all persons served. The form and
manner used by the public water system are to fit the specific situation, but must be
designed to reach residential, transient, and non-transient users of the water
system."

14

34.    Minimum notice requirements are laid out in the regulation and the

EPA's website:

> *There are 10 required elements in a public notice. Notices must contain:*
>
> - A description of the violation that occurred, including the contaminant(s) of concern, and  the contaminant level(s);
> - When the violation or situation occurred;
> - The potential health effects (including standard required language);
> - The population at risk, including subpopulations vulnerable if exposed to the contaminant in their drinking water;
> - Whether alternate water supplies need to be used;
> - What the water system is doing to correct the problem;
> - Actions consumers can take;
> - When the system expects a resolution to the problem;
> - How to contact the water system for more information; and
> - Language encouraging broader distribution of the notice.

Public Notification Rule, U.S. Environmental Protection Agency,

https://www.epa.gov/dwreginfo/public-notification-rule (last visited Nov. 3, 2023).

35.    The Navy was not permitted to wait to notify the residents while it

investigated. The Navy's own manuals on addressing public health emergencies

for public water systems that they operate make clear that a "Do Not Use" public

notification was required:

15



**CHAPTER 5**
**WATER QUALITY FOR SHORE INSTALLATIONS**

Figure 5-31-1 Decision Process for Public Notification

1 Jul 2019                                                                 5-102

Bureau of Medicine and Surgery, NAVMED P-5010-5, Manual of Naval

Preventive Medicine, Ch. 5 Water Quality for Shore Installations (Rev. 7-2019),

https://www.med.navy.mil/Portals/62/Documents/BUMED/Directives/All%20Pub

s/5010-5.pdf. The decision chart is simple: if the contaminant is unknown, "Issue a

'do not use' notice."

> **D. After the release, the Navy failed to warn residents of the danger.**

36.     The Navy knew of a chemical spill that "significantly increase[d] the

16

potential for drinking water contamination" on November 20, 2021. But the Navy

failed to issue a Tier 1 notice to water system customers.

37.    Despite a legal obligation to do so noted by the EPA in their

investigation report, the Navy failed to provide notification to water system

customers in the required timeframe after "confirming the Red Hill Shaft had been

contaminated with JP-5 fuel." *See* Redacted National Enforcement Investigation

Center Civil Investigation Report, Joint Base Pearl Harbor-Hickam Public Water

System, Environmental Protection Agency at 5,

https://tinyurl.com/EPAInvestigation.

38.    On November 21, 2021, the Navy public affairs office issued a media

release regarding the JP-5 fuel spill, stating that "personnel responded to what was

initially assessed as a water leak shortly after 1700 (5:00 pm) on November 20,

2021. This pipe is not connected to the Red Hill Fuel tanks or main fuel pipelines,

all of which are secure. Overnight, the blast began to contain some amount of fuel

which increased into Sunday (November 21, 2021) morning. Approximately

14,000 gallons of a mix of water and fuel was contained in the lower tunnel . . .

and has been recovered and transferred to an above-ground storage tank as of

midday Sunday. The Navy made initial notification to the DOH Saturday night

(November 20, 2021) and is providing updates Sunday. *There are no signs or

indication of any releases to the environment and the drinking water remains safe*

17

*to drink.*" *Id.* at 5 (emphasis added).

39.     On Saturday, November 27, 2021, at 1817 (6:17 p.m.), a JBPHH

housing manager received a customer complaint of a chemical smell in the water.

By 0500 (5:00 a.m.) on November 28, 2021, JBPHH housing managers had

received 42 customer complaints regarding water quality. *Id.* at 6.

40.     On the evening of Sunday, November 28, 2021, a water sample was

collected that "smelled of fuel" and the Red Hill main pump #2 was secured, but

the Navy did not notify water customers. To the contrary, the Navy issued a press

release that evening that stated that there was "no indication the water was not

safe."

41.     On November 29, the Hawaiʻi DOH put out an advisory to "all Navy

water system users avoid using the water for drinking, cooking, or oral hygiene."

The advisory covered Aliamanu Military Reservation, Red Hill and Nimitz

Elementary schools, and military housing. Officials said that all of the complaints

received were from users of the Navy's water system. "As a regulated water

system under the jurisdiction of the DOH's Safe Drinking Water Branch, the Navy

is responsible for maintaining a safe and reliable source of drinking water to its

customers and to provide alternative sources of drinking water for human

consumptive uses as deemed necessary," the advisory said.

42.     On November 29, by contrast, the Navy again stated there was no

"immediate indication" that the water was unsafe. Captain Erik Spitzer, USN, Commander of JBPHH, told residents in military housing communities on November 29, "My staff and I are drinking the water on base this morning, and many of my team live in housing and drink and use the water as well."

43.     Ten days after the blast, on November 30, 2021, the Resident Services Office sent an email to families stating that the Navy had not detected petroleum constitutes in the water. They asked that all JBPHH residents flush their water systems. And they stated that they were still investigating the "source" of the odor.

44.     Despite a full awareness of the proximity of the Red Hill well to the massive fuel blast a few days earlier, and an immediate conclusion from first responders that the odors were related to the release, military officials denied knowledge of any connection when asked. At a town hall that evening, Rear Admiral Timothy Kott said, "The . . . bottom line fact is we do not have any testing that has revealed a source of the smell or the odor." Rear Admiral Converse on the same evening stated at a separate town hall, "We first have to figure out what is in the water."

45.     These actions constituted negligent undertaking and failure to warn. A lessor has a duty to warn a lessee of dangerous conditions that are known to the lessor but not known or obvious to the lessee – even when the dangerous condition exists in an area not controlled by the lessor. The misrepresentations (that the water

19

was safe to drink) were only collateral to the significant operational negligence described that primarily caused the injury. They are not excepted under the misrepresentation exception. *Holcombe v. United States*, 388 F. Supp. 3d 777, 794 (W.D. Tex. 2019) ("The government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved.") The Government as lessor had a duty to *warn* affected families of the contamination and failed to do so.

### E. The Navy did not announce the leak's impact on the water until December 2, 2021— twelve days after the release.

46.     On December 2, 2021, the Navy finally announced that it detected petroleum products in its Red Hill Shaft. Rear Admiral Blake Converse stated: "We identified the petroleum products from two different tests. One test was taken on Sunday night shortly after this incident was identified to the Navy. And that test identified trace amounts of very volatile hydrocarbons, which would normally be associated with something like a JP-5 or a diesel fuel." The second test found "clear indications of petroleum products in the gas space just above the waterline in the Red Hill well," Converse said. "With both of those, we have pretty conclusive indications that there are volatile petroleum products in the well and we've determined that is the likely source of the contamination of our water distribution system."

47.     Follow-on tests were no more encouraging. On December 10, test

results from the DOH showed that hydrocarbons associated with diesel fuel were detected at **350 times** the level the health department considers safe (the Environmental Action Level). A California lab found 140,000 parts per billion of total petroleum hydrocarbons as diesel or TPH-d. The DOH Environmental Action Level is 400 ppb. The water in the Red Hill shaft also showed gasoline hydrocarbons 66 times higher than the level considered safe. The lab found total petroleum hydrocarbons as gasoline at 20,000 ppb. The Environmental Action Level for TPH-g is 300 ppb.

### F. The Navy took responsibility for the fuel blast but not for its failure to warn.

48.    Later, the Navy took responsibility for the failures at Red Hill. In January 2022, Admiral Blake Converse said, "I want to start by saying that the Navy caused this problem, we own it, and we're gonna fix it." Later, Admiral Paparo reiterated:

> The Navy is responsible for the 6 May 2021 and 20 November 2021 fuel spills at the Red Hill Bulk Fuel Storage Facility (Red Hill) and subsequent water contamination.
>
> The Navy has a moral obligation and ethical duty to fix our mistakes, safeguard the environment, and rebuild trust. We must act.

*See* Cavanaugh Report at 127.

49.    The Navy has not taken responsibility for failing to warn residents of the fuel release.

21

**G. The Navy knew it was not safely operating the Red Hill fuel tank system.**

50.     These events were entirely foreseeable and preventable. The Navy knew that it was not properly operating the Red Hill fuel tank system in a manner that would prevent a fuel leak.

51.     In an effort to mitigate the risk associated with inadvertent releases of fuel from the Red Hill facility, the Navy established an agreement with the State of Hawaiʻi sin January 2008: "Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan" (GPP). The GPP documented leaks from various tanks from the 1940s to the 1980s, totaling up to 200,000 gallons of dangerous fuel. The Plan stated:

> In order to mitigate the risk associated with future releases, the U.S. Navy *will*: Implement a rigorous tank maintenance program, and Continue to research and investigate a viable leak detection system for the Facility. . .

Department of the Navy, Commander Naval Facilities Engineering Command, Pacific, *Red Hill Bulk Fuel Storage Facility Final Groundwater Protection Plan: Pearl Harbor Hawaiʻi* (Jan. 2008), https://tinyurl.com/RHFGPP (emphasis added).

52.     The Navy's own audit confirmed that it was not complying with the requirements of the Final Groundwater Protection Plan. Between October 2008 and May 2010, the Navy conducted an audit of the Red Hill facility. In August 2010,

22

the Navy completed its audit report and found "four areas of concern" that included: "groundwater contamination; tank inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions *required* by the GPP." Naval Audit Service, *Audit Report: Department of the Navy Red Hill and Upper Tank Farm Fuel Storage Facilities (Redacted)* at 9 (Aug. 16, 2010) (made available by the Board of Water Supply), https://tinyurl.com/NavyAudit (emphasis added). "Based on the results of the audit work, we determined that the environment and groundwater sources in the Pearl Harbor area have not been sufficiently protected." *Id.* at 11.

53.    In January 2014, an improperly repaired fuel tank leaked up to 27,000 gallons of JP-8 jet fuel at the facility. Test results in soil vapor and groundwater in and around the tank indicated a spike in levels of hydrocarbons.

54.    In the wake of this error and in order to prevent additional fuel leaks, the Navy entered into an Administrative Order on Consent (AOC) with agencies including the DOH and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely—an order that remains in effect to this day.

55.    The "Frequently Asked Questions" in the AOC indicated a full awareness of the threats facing the Red Hill facility:

What is the likelihood of a future catastrophic release at the Facility? . . .

23

The most likely catastrophic release scenario would be a piping failure with a release into the lower access tunnel. This vulnerability is being addressed by the Navy and DLA with the installation of oil tight doors in the tunnel system, along with a new fire suppression system to reduce the threat of a release caused by fire. Furthermore, the piping in the lower tunnel system is not buried or concealed and is visually inspected daily.

*Red Hill Bulk Fuel Storage Facility – Frequently Asked Questions*, Environmental

Protection Agency, https://tinyurl.com/EPARHFAQ.

56.     A risk assessment report prepared by defendant's own consultant in

2018 described the chances of future fuel releases at the Red Hill facility as:

- Greater than 27% probability of a sudden release of between 1,000 and 30,000 gallons of fuel each year.

- Greater than 34% chance of a sudden release of more than 120,000 gallons from the [Red Hill] in the next 100 years.

NAVFAC Pacific, *Quantitative Risk and Vulnerability Assessment Phase 1: Red*

*Hill Bulk Fuel Storage Facility, NAVSUP FLC Pearl Harbor, HI (PRL)*

(November 2021) at pp. 12-29, 14-1, https://tinyurl.com/RHRisk.

### H. The Navy's "flushing" and other cleanup efforts added insult to injury for affected families and compounded the toxic harm.

57.     As the extent of the crisis became undeniable, a series of senior U.S.

Government officials apologized and promised to make things right. Captain

Spitzer, who had previously told families the water was safe to drink, backtracked

and apologized, "I regret I did not tell our families not to drink the water." On

December 6, Secretary of the Navy Carlos Del Toro, on a previously scheduled visit to Hawaiʻi for the 80th Anniversary of the attack on Pearl Harbor, toured the facility. He publicly apologized for the crisis and said, "We are committed to rebuilding this trust. We're doing everything we can try to fix the problem."

58.     He also finally announced to the public that the Navy had temporarily suspended the use of the fuel tank facility nine days earlier on November 27 – days before they warned residents of any toxic danger to their water.

59.     On December 14, the Deputy Secretary of the Department of Defense, Dr. Kathleen Hicks, visited. "At DoD, we recognize the need to continue to care for all affected personnel and their families and help them return to their homes in a safe and expeditious manner," she said, "We also recognize we need to double down on our efforts to earn the trust and confidence of the people of Hawaiʻi in our ability to manage this situation. . . I am committed to ensuring the health and well-being for our Service Members, their families, the people of Hawaiʻi, and the environment." Statement by Deputy Secretary of Defense Dr. Kathleen Hicks Following Her Visit to the Red Hill Bulk Storage Facility in Hawaiʻi, (Dec. 14, 2021), https://tinyurl.com/HicksStatement.

60.     In spite of the promises, the actual efforts to remediate the water situation only compounded the harm. The Navy's initial flushing program asked residents to run their water, and flush toilets and other devices to remove

contaminants. Some residents reported that chemical fumes became overwhelming when they started flushing. The Agency for Toxic Substances and Disease Registry (ATSDR) makes clear that fuel fumes constitute additional exposure to the chemicals—as does the military's occupational risk protocol for exposure to benzene. Families will testify that the flushing exacerbated their symptoms. In addition, many of the Government personnel flushing these homes did so negligently, leaving water damage and more toxicity behind—causing further harm. Air tests of affected homes show that the aerosolized jet fuels were measurable weeks later. Most flushing teams emptied water heaters directly into the yards—adding the toxins to the soil, which would then infiltrate the ground water and further contaminate the environment.

61.    The Navy also opened water hydrants to run into residential streets, yards, and storm drains that run into the ocean—in violation of law. The Clean Water Act (CWA) regulates the discharge of pollutants and defines "discharge of pollutants" as "any discernable, confined and discrete conveyance from any point source." 33 U.S.C. § 1362(12). The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, Section 301(a) prohibits the discharge of any pollutant into waters of the United States that are not authorized by a National Pollutant

Discharge Elimination System (NPDES) permit issued pursuant to section 402(b). 33 U.S.C. §§ 1311, 1342(b).

62.    Section 301(a) of the CWA provides that "the discharge of any pollutant by any person shall be unlawful" unless the discharger is in compliance with the terms of an NPDES permit. 33 U.S.C. § 1311(a). The Navy is a "person" as defined in the CWA and has waived its sovereign immunity under the Act. *See* 42 U.S.C. § 6903(15); 33 U.S.C. § 1365(a)(1).

63.    On November 29, 2021, residents of the military housing communities captured video of Navy personnel illegally flushing contaminated water directly into residential streets and storm drains. The DOH confirmed that such flushing of tainted water occurred in violation of the CWA and Hawaiʻi Revised Statutes Chapter 342D-50, which prohibits the discharge of pollutants to state waters without a permit issued by the Director of Health. The brazen violation of environmental laws constitutes negligence. The DOH issued a cease-and-desist order to the Navy to stop the illegal flushing.

64.    Furthermore, the Child Development Centers run by the military to provide childcare on base continued to have children use dangerous and contaminated water long after the contamination began. Despite repeated attempts to have the centers verify that children's porous plastic drink cups had been replaced, the Child Development Center was unable to confirm the replacement of

27

all contaminated items known to pose a risk of exposure.

65.     And the Navy's response only compounded the harm to affected families. On December 2, the U.S. Army authorized evacuation and lodging expenses for affected families. The Navy did not do so until a day later, almost a week after water complaints began to flood in. The Navy estimates approximately 3,200 families were displaced from military housing to live temporarily in hotels. Families of four remained in single hotel rooms, where they lived for months.

66.     On February 14, 2022, water in one portion of the Red Hill housing complex was cleared as safe to drink by the DOH. This clearance was based on testing only 10% of the affected homes despite repeated requests from families to test all the homes.

67.     Premises plumbing, such as water heaters, were not fully inspected, remediated, or replaced after the water contamination event despite plaintiff concerns about that source of exposure. Nor did the flushing effort include scrubbing the air of the air contaminants—a common practice in remediation. Nor did it include "pigging" – another practice to remove contaminants trapped in metal piping of a water system.

68.     Once the Government cleared neighborhoods as "safe," families were forced to move back into the homes that made them sick. Many families got sick immediately upon moving back into the homes. Residents reported that sediment

from the fuel remained in the bottom of the water heaters, and they continued to get chemical burns during showers and experience other symptoms.

69.     As of the date of this Complaint, the Navy has maintained its refusal to replace the affected water heaters.

70.     A report by the EPA from December 2022 confirms that petroleum is *currently still detectable* in the water at homes on the water line:

> [A] report from the Environmental Protection Agency released this week confirmed that there are still detectable levels of fuel in some homes on the Navy water system.

> EPA investigators tested four homes of residents complaining of symptoms. Three of them had traces of petroleum in the water . . . — including the Dietz family's. In each case, previous Navy testing had shown no traces.

Kevin Knodell, Fuel Found in Some Homes on Navy Water System, New EPA Report Finds, Honolulu Star-Advertiser, Dec. 22, 2023.

71.     During their visits to military housing in October 2023, EPA investigators observed an oily sheen and ongoing health symptoms including rashes that "may have a potential connection with showering/bathing based on residents' description". The EPA reports recommends the Navy revise and improve their operating procedures for responding to resident complaints about water quality and ongoing health symptoms.

72.     The EPA's report flags for particular concern premises plumbing and calls for "[i]nspection and/or sampling of water heaters and premise plumbing" to

"[i]nvestigate whether flushing, maintenance and/or replacement of the water heaters at affected homes may resolve symptoms." U.S. EPA, *Report on Red Hill Investigation: Drinking Water Complaints*, (Oct. 2023), attached as Ex. 8.

73.    Other publicly available data sets confirm extensive continued detections of TPH in the JBPHH water system.



Screenshot from Joint Base Pearl Harbor Hickam Safe Waters Website, Interactive Drinking Water Results Map: Petroleum Hydrocarbons (as diesel) Detections January 1, 2023 – November 30, 2023,

https://app.powerbi.com/view?r=eyJrIjoiNTIyNDU0OTMtODgwNS00ZjQ4LTg1Y2UtODkxYTgxMjQ5NGZhIiwidCI6ImUyYzE5MDhiLTI2NzItNGE0Ni05M2ZkLTdmMDhkYTExNjZiNSIsImMiOjJ9. Such data demonstrates the failure of

remediation efforts at Red Hill.

    **I.**   **Federal officers failed to provide appropriate medical care to families affected, compounding injuries that the Navy had caused.**

74.    After May 2021, active-duty military families, covered by the TRICARE health care program, reported to military health care facilities with symptoms of toxic exposure. They suffered from stomach cramps, vomiting, diarrhea, and rashes. Some asked about polyps and lesions they had noticed. Many reported slower thinking (brain fog), and that their children, previously well behaved and advanced for their age, had begun to behave erratically, regress in developmental milestones, recede into themselves, or become confused.

75.    The standard of care for exposure to jet fuel or other drinking contaminants requires a neuropsychological assessment and baseline labs, including a comprehensive chemistry panel to test renal function, liver function, electrolytes, and complete blood count (CBC). Patients should also likely receive an X-Ray or EKG.

76.    In fact, the Government recognizes the risk of benzene exposure in its' own policies and procedures—and has a clear testing approach to addressing such risk. In DODD 6055.05-M, military personnel who have occupational exposure to benzene get an initial and annual exam. They are "required" to get a "complete blood count" with "results reviewed by an examining physician." If they have faced "emergency exposure," they are to receive an "end of shift urinary

phenol test." The Department of Defense Occupational Health Surveillance

Manual, DODD 6055.05-M (4 May 1998 as amended in 2018).

77.     These standards were not met. When the plaintiff families presented

to emergency rooms or "exposure tents" that were set up by the Army and Navy,

most were denied any tests or labs. Families have even been told that testing is

"impossible" and that the toxicologist at Walter Reed advised against ordering labs

or other tests for fear of the implications of the care that would be required

thereafter.

78.     Not only did military providers fail to meet the standard of care upon

initial exposure, they failed to follow the appropriate protocols to treat the plaintiff

families thereafter. Their care has been rife with medical delay, failure to treat, and

failure to diagnose.

79.     For example, military providers have failed to screen for the illnesses

that the Government itself has documented as related to exposure to water

contaminated with jet fuel. Military providers repeatedly told patients that there is

simply "no research" on the issue—notwithstanding the volumes of Government

research on similar circumstances at Camp LeJeune. Camp Lejeune, North

Carolina, Agency for Toxic Substances and Disease Registry,

https://www.atsdr.cdc.gov/sites/lejeune/index.html.

**J.   After litigation began, reports emerged that the Navy discarded critical evidence that would have revealed the extent of the harm they caused.**

80.    In September 2022, reports emerged that water samples taken by Government personnel from over 1,000 affected homes were "never tested for fuel" and were ultimately discarded. Sophie Cocke, *Hundreds of Water Samples Never Tested for Fuel*, HONOLULU STAR ADVERTISER (Sept. 6, 2022), https://tinyurl.com/RHWaterSamples. Military officials such as Admiral Timothy Kott told families in town halls after the contamination, "We are working aggressively to try to figure out what is in the water." *Id.*

81.    However, the Navy's flushing of its "main distribution system" and family homes "likely diluted" the presence of contaminants and diminished the ability to ascertain the chemical composition in the contaminated water. *Id.* The Navy ultimately collected water samples from over 1,000 homes, but never tested these samples for "petroleum chemicals":

> Instead, the Navy did a rough screening of the samples for total organic carbon, which can indicate that the water is contaminated but not with what.

*Id.* The Navy then represented these tests on their online database as "non-detect." *Id.*

82.    "The Navy could have sent the samples that it collected from homes to the EPA labs for additional testing, but instead *says it dumped the water and*

33

*threw out the vials after one month of storage.*" *Id.* (emphasis added).

83.     The failure to test comprehensively at the time and for the appropriate substance undermined the ability of public health officials to understand the full extent of exposure. As Dr. Roger Brewer of the DOH wrote publicly:

> Sample collection and testing by both the Navy and the Hawaiʻi [DOH] during flushing of the drinking water system focused on testing of water anticipated to be clean. These data cannot be assumed to be representative of contaminant types and exposure conditions during the initial contamination period or other episodes when health effects took place. To the authors' knowledge, no sample data collected within the JBPHH system exist that document actual exposure conditions at the time of acute to subchronic health effects experienced by residents.

Brewer, R. Exposure Assessment: November 2021 Release of JP5 Jet Fuel into the Joint Base Pearl Harbor Hickam Drinking Water System. Hazard Evaluation and Emergency Response, Hawaiʻi Department of Health, June 2023, https://health.hawaii.gov/about/files/2023/06/JBPHH-JP-5-Exposure-Assessment-HIDOH-June-2023.pdf.

84.     Dr. Brewer's report discusses the efficacy of using Total Organic Carbon ("TOC") as a proxy for JP-5 contamination:

> Total Organic Carbon (TOC) . . . was intended to serve as a surrogate for more comprehensive Total Petroleum Hydrocarbon (TPH) and volatile organic compound data that could be used to directly assess health risks but could take up to two weeks to report (USDN 2022a). *Laboratory data for TOC were later determined to be unreliable due to the elevated laboratory detection limit in tapwater (up to 5,000 µg/L) and the inability of the data to identify water that was obviously contaminated with fuel in the field.*

34

Brewer, R. *Exposure Assessment: November 2021 Release of JP-5 Jet Fuel into the Joint Base Pearl Harbor Hickam and Connected Drinking Water Systems.* Hazard Evaluation and Emergency Response, Hawai´i Department of Health, June 2023 (last updated October 2, 2023) https://health.hawaii.gov/about/files/2023/10/JP-5-Exposure-Assessment-June-2023-updated-Oct-2-2023.pdf.

85.   In a video report, Dr. Brewer states that the detection levels used for testing TOC were too high (5 mg/L) to detect JP-5 constituents which left the DOH with, "no data for a contaminated drinking water system." Dr. Brewer states that, "TOC data is totally unreliable" and that, "some samples that were obviously heavily contaminated (with) jet fuel came back non-detect for total organic carbon." Dr. Brewer Video Report, available at: https://www.youtube.com/watch?v=aKpDPX8_Z9k.

86.   Dr. Brewer also noted "corrosivity of water from hot water heaters. . . possibly due to corrosion of the water heater sacrificial anode by jet fuel. Residents reported that persistent skin rash problems following flushing of the drinking water system disappeared *following replacement of the water heater* at the home." Brewer Exposure Assessment at 9.

35

### K. Additional leaks of dangerous substances from the Red Hill facility raise additional questions as to contaminants in the water from the fuel leak.

87.     On November 29, 2022, another leak of dangerous substances

occurred at Red Hill. Late that day, approximately 1,100 gallons of toxic fire-

suppressing foam leaked into topsoil and into the underground facility, according

to the Hawai'i state health department. State of Hawai'i, Department of Health,

*Red Hill AFFF Fire Suppressant Spill – Dec. 2 Update* (Dec. 2, 2022),

https://tinyurl.com/RHSpillDecUpdate. So-called "forever chemicals" – or PFAS –

were released into the environment by the spill. Often used to suppress fuel fires,

the aqueous film forming foam (AFFF) contains chemicals known to cause cancer.

U.S. Centers for Disease Control, *Per- and Polyfluorinated Substances (PFAS)*

*Factsheet - CDC*, https://www.cdc.gov/biomonitoring/PFAS_FactSheet.htm. So

far, the Navy has refused to release videos of the incident, prompting more distrust

of the Navy around Oʻahu. Sophie Cocke, *Navy Refuses to Publicly Release Video*

*of Latest Red Hill Spill*, HONOLULU STAR ADVERTISER (Dec. 6, 2022),

https://tinyurl.com/RefusesRelease; *Off The News: Navy's Changing Story on*

*Video*, HONOLULU STAR ADVERTISER (Dec. 6, 2022),

https://tinyurl.com/VideoEditorial.

88.     Recently, the Government for the first time acknowledged that

another PFAS spill occurred in December 2019 and contaminated the soil outside

of the Red Hill Facility. Sophie Cocke, *Toxic Red Hill Spill in '19 Affected Soil,*
*Navy Reveals*, HONOLULU STAR ADVERTISER (March 18, 2023),
https://www.staradvertiser.com/2023/03/18/hawaii-news/toxic-spill-in-2019-
affected-soil-navy-reveals/. The Navy told no one about this contamination for
over three years, claiming it was "not required to report the incident to regulatory
agencies." *Id.*

89.    Contemporaneous tests also showed the presence of 2-(2-
Methoxyethoxy) ethanol in Plaintiffs' contaminated water, a fuel system icing
inhibitor added to the JP-5 at the Red Hill facility. This dangerous chemical has
shown reproductive toxicity effects on laboratory animals. Despite any belated
warnings about jet fuel contamination, Plaintiffs have never been warned that their
contaminated water also contained this form of de-icing agent.

90.    The Government has still not disclosed the full list of contaminants
released from the fire suppression line in November 2021, and many are rightfully
concerned that PFAS was among them. Victims deserve to know what they
consumed so they can monitor for the appropriate lifetime risks with doctors they
trust.

**L. The Navy's operations at Red Hill likely violated additional
   regulations.**

91.    Upon information and belief, Navy officers violated additional
regulations and mandatory requirements at Red Hill. Investigations are ongoing.

37

92.     Congress foresaw the public health harm posed by hazardous substances such as jet fuel and passed key legislation to prevent toxic exposure. In the 1970s, Congress passed the CWA and the Safe Drinking Water Act (SDWA), 42 U.S.C. §300f et seq, requiring the EPA to establish regulations ensuring clean and safe drinking water for the public. The legislation and implementing regulations are intended to prohibit the discharge of "oil and hazardous substances" into the environment because of the serious and severe threat to public health posed by these substances. *See, e.g.,* 33 U.S.C. § 1321.

93.     The SDWA was established to protect the quality of drinking water in the U.S. This law focuses on all waters actually or potentially designed for drinking use, whether from above ground or underground sources. The Act authorizes the EPA to establish minimum standards to protect tap water and requires all owners or operators of public water systems to comply with these primary (health-related) standards.

94.     National Primary Drinking Water Regulations (NPDWRs or primary standards) are legally enforceable standards that apply to public water systems. Primary standards protect public health by limiting the levels of contaminants in drinking water. The EPA provides a table listing the Maximum Contaminant Level (MCL) for various chemicals, the highest level of a contaminant that is allowed in drinking water. MCLs are enforceable standards. The MCL sets enforceable limits

for benzene (.005 milligrams per liter), toluene (1 milligram per liter),

ethylbenzene (0.7 milligrams per liter), xylene (10 milligrams per liter), and other

light petroleum distillates.

95.     The State of Hawaiʻi has adopted a State Water Code, codified in

Chapter 174C of the Hawaiʼi Revised Statutes, which states in relevant part:

> **Declaration of policy.** (a) It is recognized that the waters of the State
> are held for the benefit of the citizens of the State. It is declared that the
> people of the State are beneficiaries and have a right to have the waters
> protected for their use.

Haw. Rev. Stat. 174C-2.

96.     Hawaiʻi law also regulates potable water. The Hawaiʻi Department of

Health Rules Relating to Hawaiʻi Potable Water Systems (Hawaii Administrative

Rules [HAR] Title 11, Chapter 20) set forth Maximum Contaminant Levels of

certain chemicals in public and private drinking water systems. These MCLs are

analogous to the National Primary Drinking Water regulations but additional

substances are regulated.

97.     Federal and State programs for the management of underground

storage tanks such as Red Hill were first published in the 1980s. In January 2000,

the State of Hawaiʻi promulgated rules requiring owners and operators of such

facilities to report suspected or confirmed releases from USTs.

98.     All of these regulations provide mandatory requirements for federal

agencies and federal officers, and the extent of the Navy's violations at Red Hill

will be subject to discovery.

### M. Affected families have suffered extraordinary, compensable harm.

99.   The Navy's jet fuel leaks—and conduct thereafter—have resulted in extraordinary inconvenience, illness, economic injury, and fear for each of the affected families. As set forth below, families have experienced trauma not only from the exposure to JP-5 but also from the aftermath. They were forced back into the homes that made them sick, only to render many of them ill again. Some families then spent their life savings or gave up important careers to uproot their families and move off the island or off the water line. And for many, the search for medical care has been a wild goose chase, as Navy officials continue to proclaim that there is no long term-harm.

100.   Initial reported symptoms for these families were wide ranging, including abdominal issues, anxiety, exhaustion, headaches, muscle and joint pain, skin issues (rashes, blisters, dry skin). Many of these physical symptoms have persisted over time, and over 94% of families reported still struggling with anxiety months or years after the contamination.

101.   The symptoms these families identified track closely with the symptoms reported in a survey conducted by the Centers for Disease Control:

> Most participants reported experiencing one or more new or worsened symptoms after the incident (1,980; 87%), many of whom reported symptoms lasting ≥30 days (1,493; 75%). The largest percentages of

reported symptoms were those related to the nervous system (62%), followed by the gastrointestinal system (58%), skin (58%), ear, nose, and throat (47%), mental health (46%), eyes (42%), and respiratory system (31%).

Alyssa N. Troeschel, et al. *Notes from the Field: Self-Reported Health Symptoms Following Petroleum Contamination of a Drinking Water System — Oahu, Hawaii, November 2021–February 2022*. MMWR Morb Mortal Wkly Rep 2022;71:718–719. DOI: http://dx.doi.org/10.15585/mmwr.mm7121a4external icon.

102.   A follow-up survey conducted in September 2022 found continuing problems. 41% of respondents "reported an existing condition that had worsened," "31% reported a new diagnosis" and "25% reported a new diagnosis with no pre-existing condition." Mahealani Richardson, *Alarming new CDC survey shows 'worse health' among those impacted by Red Hill fuel spills*, HAWAII NEWS NOW, (Nov. 9, 2022), https://tinyurl.com/CDCRDSurvey. 80% of respondents reported health symptoms in the previous 30 days, and 65% had "high or very high confidence" the symptoms relate to the water contamination. Navy Water Contamination Follow-Up Survey Results, https://tinyurl.com/CDCFollowUp.

103.   In the months and years that followed, additional evidence of lingering injuries continues to emerge. In July 2023, researchers from the University of Hawaiʻi Economic Research Organization (UHERO) conducted a

survey of 174 Navy water users who had lived in affected areas during November and December 2021 and had previously participated in ATSDR studies. Preliminary results on health, economic, and social impacts from the 2021 fuel release were published on the UHERO website in January 2024. Bremer et al., Social, Economic, and Health Impacts of the Red Hill Fuel Spill: Preliminary Survey Results (Jan. 18, 2024), UHERO, https://uhero.hawaii.edu/social-economic-and-health-impacts-of-the-red-hill-fuel-spill-preliminary-results-from-a-survey/.

104.   The majority of respondents, 79%, reported ongoing or worsening symptoms. New or worsening mental health and neurocognitive symptoms were the most widely reported. Respondents also reported new or worsening gastrointestinal and dermatologic symptoms. This research was supported by funding from the Hawaiʻi DOH. The DOH along with the CDC and ATSDR assisted in recruiting participants for the survey.



**Figure:** *Responses to the question: "Please rate the following in terms of how impacted you feel your household was by the fuel spill?"*

105.   Research is also being conducted on the neurocognitive effects of the Red Hill exposure. Researchers from the SUNY Albany Environmental Health Sciences, Harvard Medical School and Western New Mexico State University are currently evaluating patients for neurocognitive and psychological symptoms. Preliminary results with a sample of thirty participants indicate that many of those evaluated suffered from impaired cognitive function and mental health effects, specifically PTSD. This research will be presented publicly as an abstract and poster at Harvard Medical School Psychiatry Research Day on March 13, 2024. Harvard Medical School, Department of Psychiatry, *Harvard Psychiatry Research Day and Mysell Lecture*, https://psych.hms.harvard.edu/research-day-mysell-lecture (last visited Jan. 25, 2024).

106.   Medical research conducted by the Government has been slow to emerge and is no more encouraging. An exploratory medical record review of health outcomes was requested by the Defense Health agency and conducted February and March 2022. 55% of 653 medical records reviewed "had a worsened or new persistent documented concern." In January 2024, these results were reported publicly by the Defense Health Agency in webinar to discuss Red Hill public health. DHA Public Health Red Hill Webinar, January 9, 2024,

https://ph.health.mil/PHC%20Resource%20Library/redhill-webinar-slides-9jan.pdf.

107.    All of the affected families are at increased risk of future medical conditions associated with the components present in their contaminated drinking water and will require, at a minimum, medical monitoring.

108.    The narratives of several Plaintiffs are outlined below:

### a.  The Hughes Family[3]

109.    In November 2021, the Hughes family, consisting of Jaclyn Hughes, her active-duty husband, and their children M.R.H., K.H., and infant M.E.H, lived in the Halsey Terrace military community. After giving birth in mid-November, her husband, fulfilling military orders in Japan, returned to bond as a new family of five. Excitement quickly faded as the Navy's fuel spill took center stage and consequences of their toxic exposure permanently altered their lives and future.

110.    Around Thanksgiving, their water had a sheen and smelled of gasoline. Jaclyn's throat was sore and burned. Her newborn son's body was covered in red rashes. The family was displaced into a government procured hotel, however, with an infant and escalating neurological changes for K.H., the room

---

[3] Claimants provided a more expansive explanation of the damages suffered by each of their families in their attachments to their SF-95 forms.

was used sparingly. While home, they showered in a camp shower that doubled as their laundry machine. Thousands of dollars were spent on supplies, filtration systems, and help to assist with infant care.

111.   After her husband's return to Japan, Jaclyn was forced to haul safe drinking water on her own. In September of 2022, she was diagnosed with a cystocele of her anterior vaginal wall, a condition she may need to have surgically repaired in the future. A specialist explained the condition is common in women in third world countries who carry heavy items soon after giving birth.

112.   It was K.H., a little girl known to be full of life and optimism, who suffered most. In December, rapid behavioral changes surfaced. In January 2022, a pediatrician referred her for a psychology assessment. The child, who once adorned her mother with hugs and kisses, became unrecognizable. During fits of rage she screamed uncontrollably and became combative. For months she refused to wear clothes due to sensory overwhelm, or safely take car rides, holding the family captive in the home that was poisoning her.

113.   In February, K.H. became self-injurious and violent. She clawed at her skin and pulled her hair out. Fueled by Jaclyn's desperation, the child was seen by numerous specialists and therapeutic professionals. With constant medical care needed, and their schedule overrun with appointments, Jaclyn's income from her business lessened dramatically. Meanwhile, the cost of care and testing from out-

of-network doctors quickly grew and remains an out-of-pocket expense.

114.   Over the course of 2022, K.H. was diagnosed with level one autism spectrum disorder, provisional hyperactivity, provisional cyclothymic disorder, and sensory integration issues (for which there is no medical diagnosis). In July 2022, she was placed on blood pressure medication to aid her constant fight or flight response. Eventually, she was diagnosed with Pediatric Acute-onset Neuropsychiatric Syndrome and provisional Obsessive Compulsive Disorder.

115.   Plans to join Jaclyn's husband in Japan became hopeless, as K.H.'s new diagnoses made the family ineligible for orders outside the continental United States. Instead, in the fall of 2022, her husband was granted compassionate reassignment back to Hawai'i. Following his return, in June of 2023, the family was reassigned for humanitarian reasons to California. Since their move to the mainland, K.H. has slowly stabilized with support from an extensive care team. Despite this, the trauma experienced and fear of what the future holds has created suffering the family may never be able to escape.

### b.  The Crawford Family

116.   In September of 2020, Emily Crawford, her husband, and their two children C.C., and R.C. moved into their JBPHH Halsey Terrace Military Community home. On a morning in late November, Emily drank water from her home, and discovered it smelled and tasted of fuel. That day, the family stopped all

use of their water. Concerned about her home's safety, she attended the Navy's town hall, and reached out to multiple agencies, the Navy included, to have her home tested for contaminants as soon as possible. They waited three months for a test to be conducted.

117.   The family reported to the Navy's "white tent" with a litany of symptoms which included gastrointestinal distress, burning/itching skin, rashes, and headaches. They were advised to increase their fluids and take Motrin. In the days and months that followed, each family member was seen at base clinics or local emergency departments for continued symptoms of exposure.

118.   At the Makalapa Clinic, Emily was given similar advice to what she received at the Navy's triage tent for her issues. R.C. was seen at the Schofield Barracks Urgent Care Center for painful urination, abdominal pain, and intestinal distress. Though she no longer ingested water from the home, C.C. also experienced recurrent intestinal issues. In early February 2022, she was seen for symptoms of stomach pain, diarrhea, lightheadedness, and headache, but left with no concrete answers.

119.   From December until March the family used a government procured hotel room for showers. Unable to trust their home's water, Emily spent thousands of dollars on filters, a delivery service, and supplies to aid in their adjustment to life without safe water. After their home was deemed safe, they attempted to return

to normal life, but showering still caused extreme reactions. Emily called appropriate entities to report their issues and symptoms. Despite having their hot water tank replaced, health issues continued. Installed water filters seemed to lessen their symptoms, but it was the permanent move from Oʻahu, in August of 2023, that brought resolution for Emily and R.C.

120.   C.C.'s gastrointestinal issues proved to be permanent. In late 2022, a pediatric gastroenterologist diagnosed her with lymphocytic colitis. Pathology reports showed increased lymphocytes and inflammatory cells due to colitis, previous infection, and toxin exposure. As recently as November 2023, she experienced a flare so painful she needed an emergency endoscopy and colonoscopy. C.C.'s life has been drastically impacted by her new and continued issues. Daily pain, nausea, and dizziness have caused educational consequences. Frequently absent, she is forced to push herself during times of sickness to keep up with peers.

121.   Although they no longer live in Oʻahu, fear of lasting harm, especially when it comes to the children, has yet to subside for Emily. Each day, as C.C. continues to struggle, Emily is faced with the question of what their future might look like.

### c.  The Delgado Family

122.   Hawaiʻi native Monique Delgado, Army veteran Scott Delgado, and

twin children K.D. and E.D. moved into the Kapilina Beach Homes Community near JBPHH in August of 2016. In late 2021, the typically healthy family experienced a drastic change in their health. In early December, symptoms of exposure prevented the family from going to school and work.

123.   Monique sought help at an urgent care center for dizziness and loss of balance but was told the staff was not trained to help with poisoning. By mid-December, the family noticed a sheen and chemical smell in their water. Monique worked with local advocacy groups to help her community. She urged local press and Government representatives to remember the native and civilian families, like her own, that could not evacuate. For months, they hauled gallons of safe water, and used baby wipes for hygiene on days they could not shower at a relative's home.

124.   In the new year, skin issues worsened. The family suffered from pus-filled bumps on their eyelids and skin. Scott experienced chemical burns and bleeding on his fingertips. Rashes covered his back, perplexing doctors. K.D. was diagnosed with a staph infection on his foot that persisted for months, despite treatment. In mid-January, Monique suffered from prolonged respiratory distress. At a local emergency department she was diagnosed with severe pneumonia, something that was eventually diagnosed as a chronic health issue.

125.   After this event, her health spiraled, and she could no longer complete

normal tasks without assistance. She took a leave of absence from her job. Asthma, dormant for fifteen years, required daily use of inhalers. Each week brought new concerns including swelling, rashes, and blackouts. As a result of the new issues and medications she became pre-diabetic, suffered vision loss, and gained over fifty pounds, something that took over a year to reverse. With constant care from numerous specialists, hopes of a return to her established and lucrative career faded as her short-term leave of absence became permanent.

126.   When her doctor suggested she evacuate the island for access to better health care, the family was heartbroken. Leaving the island was not something they imagined for themselves. In July of 2022, the family shipped what sentimental items they could salvage, and left the island in search of a brighter future. The loss of income, water costs, relocation, lease termination, loss of household goods, and continued medical costs, resulted in an estimated financial impact of well over $180,000.

127.   The Delgados had their lives turned upside down as they left behind family, their culture, and the island they hold so dear, a decision they ultimately regretted. Their new life has been filled with strife. The move set into motion a sequence of events that left the family financially destitute. Scott, a combat veteran, experienced a lapse in VA mental health care. And Monique still requires constant care from a pulmonologist as they try to heal her lungs and reverse her

body's reaction to her exposure.

128.   Despite leaving the island, the children continued to experience water-related fear. Monique and her husband still value the military as a proud veteran family, but their experience and fear of what is to come for Monique's health has shattered their faith in their Government.

### d.  The Hewitt Family

129.   In July 2021, veterans Anthony and Shannon Hewitt, with their daughter C.H. returned to Oʻahu for the second time, and moved into the JBPHH Officer's Field Military Community. After Thanksgiving dinner that same year, the family fell ill. As concern about the safety of their neighborhood's water spread, they looked toward trusted Navy officials for guidance. When the fuel spill became clear, they discontinued consumption of their home's water.

130.   Unable to evacuate due to family pets and a need for school and workplace proximity, inconvenience mounted while health concerns emerged. Despite the installment of shower filters, each family member experienced new skin issues**.** Anthony and daughter C.H. became prone to skin sensitivities and rashes. Prescriptions prescribed by an allergist in early December did little to stop C.H.'s skin changes. A dermatologist eventually diagnosed her with seborrheic dermatitis. Use of medicated topical ointments and shampoos became critical for her skin. Continued rashes on Shannon's ankles resisted topical treatment and have

recently prompted additional plans for tests for autoimmune issues and hormonal dysregulation. As of January 2024, a new mole found on Anthony's toe had been removed and sent for testing.

131.    Soon after the spill, a new and pronounced tremor was observed in Anthony's hand. The tremble was eventually diagnosed as a benign essential tremor. Severe gastrointestinal pain left him unable to sit upright on many occasions. In March 2022, with no history of gallbladder concerns, a hepatobiliary iminodiacetic acid (HIDA) scan revealed his gallbladder was functioning at nine percent. Despite having his gallbladder removed later that year, his gastrointestinal issues continued. A recent EGD showed he still suffers from moderate inflammation but did not provide clear answers.

132.    Shannon, who has preexisting autonomic issues, [4] experienced worsened nerve pain, constant sweating, and insomnia. Her throat burned and nausea became so extreme she required a dose of antiemetic medication daily. In

---

[4] Under Hawai'i law, the Navy is responsible for any predisposition to injury or preexisting injury (known or unknown) that were exacerbated by its negligence. Indeed, the Hawai'i Supreme Court has made clear that a tortfeasor is responsible "for all injuries legally caused by the defendant's negligence. However, it is well settled that a tortfeasor is liable not only for damages resulting from direct and unique injuries inflicted on the victim, but also for damages resulting from the aggravation of the victim's pre-existing disease, condition, or predisposition to injury." *Montalvo v. Lopez*, 77 Hawaii 282, 294, 884 P.2d 345, 357 (Haw. 1994). Many of the plaintiff families had preexisting injuries that the Navy exacerbated.

January 2022, both Shannon and C.H. were seen by ear, nose, and throat specialists for their burning throats. In late July that year, a Tripler neurologist confirmed Shannon suffered worsened loss of sensation.

133.   In March of 2023, bloodwork and testing revealed C.H. had severe anemia, elevated Erythrocyte Sedimentation Rate (ESR), and elevated platelets. It took nine months of iron supplements for the teenager's iron levels to stabilize to a less extreme level of deficiency. Her joint pain, which started in 2022, has since required continued physical therapy.

134.   With their trust in the safety of their water nonexistent, Anthony and Shannon tried to take matters into their own hands. However, their request to install a whole home water filtering system was met with months of red tape, and thousands of dollars' worth of out-of-pocket costs. The water crisis brought on emotional costs as well. Bodie, the family dog, also suffered health changes during the months that followed the crisis. While she has since recovered, she never returned to her normal activity level.

135.   Their peace of mind and hope for the future has been permanently damaged. They have been forced to view each new health concern through the lens of an exposure they never imagined could happen. With the health changes they have suffered thus far, they are terrified of what the future will bring, and whether they will receive care that accurately addresses their exposure.

### e.  The Long Family

136.   In December of 2019, Caroline Long, her husband, and their three children, H.L., J.L, and R.L., moved into JBPHH's Aliamanu Military Reservation (AMR) neighborhood. In late November of 2021, the family prepared to permanently change duty stations. Around Thanksgiving, Caroline and her children spent time in the home cleaning, with no knowledge of the fuel spill. It was during this visit to the home that R.L. suffered sudden projectile vomiting after showering. For the weeks before, she had also suffered heavy nosebleeds. The other children suffered from unexplained rashes and itchy skin.

137.   Soon after, Caroline discovered there was a sheen and fuel scent in the home's water. In early December, as news of the Navy's fuel spill spread, the family permanently moved out of the home, and checked into a government hotel on Ford Island. At the time, they believed the Navy's guidance that Ford Island was not affected, and used the water in the hotel normally until they left the island for their new duty station. Before they left, Caroline reported R.L.'s symptoms to the Makalapa Clinic.

138.   During their stay at the hotel Caroline became extremely ill. She was admitted to The Queen's Medical Center Oahu West's emergency department where doctors discovered a severe infection in her ureter, which had a stent placed in it years before. Caroline's condition shocked doctors, and she was told her

54

infection was life threatening. A couple of weeks later, the family moved to California.

139.   Throughout 2022, both of Caroline's sons, who had no previous concerns, were diagnosed with autism. Additionally, in February 2022, Caroline underwent another surgery to reconstruct her ureter. Blood panels revealed a low white blood cell (WBC) count so extreme it required additional testing. After two bone marrow biopsies were completed, the last of which was done in February 2023, doctors explained Caroline's cells were abnormal and appeared to be those of someone who was twice her age or had been exposed to either radiation or contamination.

140.   Caroline has continued to fear how the exposure may have affected her own body, but even more so for the unknown ways it could have impacted her children.

### f.  The McCart Family

141.   In March 2019, military spouse Dana McCart, her husband, and their two children, A.M. and S.M., moved into the Catlin Park Military Community on JBPHH. With no unusual health concerns, the family enjoyed life on the island. At the end of November of 2021, the family struggled with a multitude of issues: headaches, nosebleeds, mouth sores, burns, and rashes.

142.   It wasn't until days later they realized their home's water had a sheen,

smelled of gasoline, and was contaminated. They placed an emergency maintenance request but were simply told to let the water run. Unable to evacuate due to pets, they adapted to life without access to safe water. They procured water filtration systems, an out-of-pocket cost, to avoid their tap water. The family was forced to haul water daily for all their household and hygienic needs.

143.   By March 2022, S.M. had nosebleeds that had become constant and painful. It was their severity that prompted her mother to push for answers from doctors. Bloodwork at a July appointment revealed an abnormality, and she was referred to a hematologist. In October, she was diagnosed with Platelet Storage Poole Disorder. After doctors ordered extended avoidance of the home's water resulted in normalized platelet aggregation studies, the family was told S.M.'s defect was likely acquired. Additionally, S.M.'s disorder affected her blood volume, which resulted in a heart murmur.

144.   The diagnosis of the blood disorder, considered a lifelong disability, had immediate daily consequences. The once healthy child was no longer able to play as normal children her age do. Protective measures were put in place to lessen her chance of injury. Even a small cut can bleed for an extended time period. She is required to carry a pouch with instructions and medications in the event she is hurt while away from her parents, as a major injury could prove fatal if her blood disorder is not addressed quickly. Per doctor's orders, she no longer interacts with

the home's water outside of time-limited showers.

145.   With continued skin blistering and other concerning changes, A.M. will soon be screened by a dermatologist. Since the fuel spill, Dana has been diagnosed with lesions in the brain and an upper nerve in her body. Gastrointestinal issues and severe migraines have yet to subside, as she waits on future appointments.

146.   Now enrolled in the Navy's Exceptional Family Member Program, the family must factor S.M.'s disability into all aspects of life, including future military duty stations. The serious nature of her disorder prompted the family to request an early return of dependents from the military. Despite documented recommendations from medical providers, as well as Dana's husband's chain of command, the family has been told the relocation can only be approved if recommended by military providers. The family is stuck, and deeply fear what else could come from their exposure as they continue to live in the home that poisoned them.

### g.  The Wilson Family

147.   In August 2020, retired Lieutenant Colonel Anthony Wilson, his wife, attorney Raechel Wilson, and their two children L.W., and V.W. moved into their JBPHH Hickam Field Military Community home. Between considerations for their son, L.W., who is autistic, and Anthony's pre-existing autoimmune disorder, the

family maintained a healthy active lifestyle in paradise. But about a year into their time on Oʻahu, they experienced substantial health changes.

148.   In late November, the couple learned of the Navy's fuel spill but followed Navy guidance that their water was safe. When they observed the response of other military branches, they ceased use of the water out of caution. Unable to evacuate due to in-home therapy needs for L.W., they depended on bottled water for dietary needs, and used a homemade camp shower for hygiene.

149.   After the spill, Anthony's energy levels decreased, an issue eventually connected to malabsorption. Raechel struggled with dizziness, gastrointestinal issues, and chronic fatigue, all of which became permanent. Concerned, her primary care doctor later referred her to a gastroenterologist, yet Raechel found herself unable to follow through with appointments paralyzed by the fear of what could be revealed.

150.   L.W. no longer progressed in weekly therapies, and his sister, V.W. exhibited unexplained behavioral changes, gastrointestinal issues, and complained of constant pain. In December 2021, only 6 years old at the time, L.W. had manic episodes so extreme his doctor prescribed Lithium. Soon after, a Tripler child psychologist suggested the antipsychotic drug Abilify, a recommendation his parents declined in fear of the devastating and lifelong consequences the drug could have on a young child. His reading and writing skills declined, leading to a

diagnosis of visual processing delay.

151.   V.W. exhibited neurological changes as well. In January 2022, she was diagnosed with autism, a diagnosis her current doctors disagree with since testing results show no mitochondrial dysfunction or disease. In the new year, her gastrointestinal issues and pains worsened. Doctors focused on treating suspected constipation in hopes the physical issues were related. After diagnostic testing was completed, a provider explained her gut health had been altered by environmental factors. For L.W., a more recent doctor's visit revealed he has suffered gastrointestinal dysfunction.

152.   In 2023, brain scans showed the children's brains looked similar. L.W.'s results were consistent with the double concussion he suffered earlier in life, but V.W. had no previous injury. Their doctor explained that brain injury is a known result of toxic exposure. Eventually, Raechel was diagnosed with chronic fatigue, mitochondrial dysfunction, and low stomach enzymes. Her hormonal levels were considered menopausal. Recently, a psychologist diagnosed Raechel with cognitive decline.

153.   As of January 2024, toxicity test results showed high levels of MTBE in Raechel and the children's bodies, despite persistent efforts toward detox. Raechel and the children moved to the big island in August of 2023, at the cost of five months of separation. In December 2023, Anthony left behind his stable

employment to join them.

154.   Before the fuel spill, the family purchased a farm, in hopes of fulfilling dreams of becoming profitable with farm produced goods. With the water crisis, their timeline shifted, and they moved to the farm in vastly different physical and financial circumstances than planned. Instead of working their farm, they have found themselves, and every dollar they have, focused on recovering from the continued physical, psychological, and financial impact of their exposure on Oahu.

CAUSES OF ACTION

COUNT I: NEGLIGENCE

155.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

156.   The United States owns and operates the Red Hill Bulk Fuel Storage Facility.

157.   The United States had a duty to exercise reasonable care in the operation and maintenance of the Red Hill Bulk Fuel Storage Facility.

158.   Federal officers breached the duty to exercise ordinary care at Red Hill in at least the following respects:

    a.   Officers failed to adhere to the proper valve sequencing in May 2021;

    b.   Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

c. Officers violated mandatory provisions of the Safe Drinking Water Act;

d. Officers failed to install or replace pipes with mandatory steel piping;

e. Officers knew or should have known of the fuel trapped in the PVC piping between May and November 2021 and failed to take corrective action;

f. Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

g. Officers ordered inexperienced servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

h. Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm;

i. Officers failed to test water samples for petroleum and destroyed water samples from affected homes; and

j. Various other safety violations and breaches to be determined upon discovery.

159.   As a direct and proximate result of defendant's breach of duty of care, the Plaintiffs have been injured.

160.   As a direct and proximate result of the negligence of defendant and its

officials, the Plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

161.   As a direct and proximate result of the negligence of defendant and its officials, the Plaintiffs suffered special damages and will require testing/medical monitoring.

162.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the Plaintiffs for the negligence of the United States.

COUNT II: NEGLIGENT UNDERTAKING

163.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

164.   "The Supreme Court has repeatedly found that the United States can be held liable under the Federal Tort Claims Act if a private person would face good Samaritan liability under state law." *Williams v. United States*, 711 F. Supp. 2d 1195, 1207 (D. Haw. 2010) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955)).

165.   Hawaiʻi state law recognizes liability related "to the voluntary assumption of a duty or undertaking." *Id.*

166.   The Navy voluntarily undertook the responsibility to provide safe drinking water to all those on the Navy water line on Oʻahu. Having undertaken

that responsibility, the Navy was required to do so with reasonable care.

167.   Furthermore, federal law and "regulations can give rise to a state-law duty under the good Samaritan doctrine. *Id.* at 1208.

168.   The United States Congress voluntarily undertook the creation of laws such as the Safe Drinking Water Act and the Clean Water Act to avoid the foreseeable harms of toxic water contamination. United States agencies such as the Environmental Protection Agency and the Department of Defense undertook to establish specific regulations, orders, and decrees to implement those laws and avoid harms to public drinking water systems, including:

   a. Establishing "specific Operations Orders" to conduct appropriate valve opening and closing sequencing to avoid fuel spills.

   b. Mandating the use of "schedule 40 steel pipe" instead of PVC plastic piping for fire suppression systems like the Red Hill system under the Unified Facilities Criteria specifications for the Department of Defense's Fire Protection Engineering for Facilities, UFC 3-60-01, Section 9-9.2.1.

   c. Requiring the issuance of a Tier 1 public notice "no later than 24 hours" after learning of violations of the national primary drinking water regulations with "significant potential to have serious adverse effects on human health" as required by 40 CFR §141.201.

d. Prohibiting the "discharge of any pollutant into waters of the United States" without authorization under 33 U.S.C. § 1311(a).

e. Establishing standards of care when military personnel experience exposure to benzene, including requiring "complete blood count" with "results reviewed by an examining physician," and if they faced "emergency exposure," receiving an "end of shift urinary phenol test" under The Department of Defense Occupational Health Surveillance Manual, DODD 6055.05.

169.   Furthermore, the Department of Defense explicitly undertook to pursue "corrective actions" on multiple occasions regarding water contamination at Red Hill, including:

a. Establishing a Final Groundwater Protection Plan with the State of Hawaiʻi in 2008 to "mitigate the risk associated with future releases" from the fuel tanks, including plans to "implement a rigorous tank maintenance program" and "research and investigate a viable leak detection system."

b. Entering into an Administrative Order on Consent in 2014 with agencies including the Hawaiʻi DOH and the EPA to take steps to ensure that the groundwater resource in the vicinity of the Facility is protected and the Facility is operated and maintained safely, with a

specific focus on a "catastrophic release scenario" involving "a piping failure with a release into the lower access tunnel" that was "being addressed by the Navy and [Defense Logistics Agency]."

c.  Undertaking in a 2021 Mitigations Report the proper construction of the pipeline system, safety alarms to be restored and updated to proper working order, and clear instructions to follow the existing rules set forth by the Department of Defense (October 2021 Mitigations Report).

d.  After the fuel release, frequent statements by defendants accepted responsibility for failures at Red Hill and undertook to "fix" them.

    i.  In January 2022 Admiral Converse stated, "the Navy caused this problem, we own it, and we're gonna fix it."

    ii.  On December 6, Secretary of the Navy Carlos Del Toro, publicly apologized for the crisis and said, "We are committed to rebuilding this trust. We're doing everything we can try to fix the problem."

    iii.  On December 14, 2021, Deputy Secretary of Defense Dr. Kathleen Hicks stated, "I am committed to ensuring the health and well-being for our Service Members, their families, the people of Hawaiʻi, and the environment."

65

170.   Follow up audits and reports show that these undertakings were conducted negligently:

    a.  The Navy's audit confirmed it was not complying with the requirements of the Final Groundwater Protection Plan by finding "four areas of concern" including "groundwater contamination; tank inspection and maintenance requirements and schedule; detection of fuel releases; and completion [non-compliance] of response actions required by the GPP." This audit led to additional commitments in the audit itself to the undertaking to "sufficiently" protect the environment and groundwater sources.

    b.  The Cavanaugh Report shows that these undertakings were conducted negligently, and the Navy again undertook to fix the problems: "The Navy has a moral obligation and ethical duty to fix our mistakes, safeguard the environment, and rebuild trust. We must act."

171.   The United States, through Congress and its agencies, rendered these services because Congress and the agencies recognized that they were necessary for the protection of individuals like the Plaintiffs.

172.   Federal officers breached the duty to exercise ordinary care after an undertaking in at least the following respects:

    a.  Officers failed to adhere to the proper valve sequencing in May 2021;

66

b.  Officers failed to implement mandatory corrective actions after the May 2021 leak and prior leaks;

c.  Officers violated mandatory provisions of the Safe Drinking Water Act;

d.  Officers failed to install or replace pipes with mandatory steel piping;

e.  Officers knew or should have known of the fuel trapped in the PVC piping between May and November 2021 and failed to take corrective action;

f.  Officers failed to warn residents that the leaks had occurred in violation of federal and state law;

g.  Officers ordered inexperienced servicemembers to flush hazardous fuel into groundwater without a permit and in violation of federal and state law;

h.  Officers knew that maintenance failures had compromised Red Hill and failed to take corrective action to prevent harm;

i.  Officers failed to properly remediate affected homes;

j.  Officers failed to test water samples for petroleum and destroyed water samples from affected homes; and

k.  Various other safety violations and breaches to be determined upon discovery.

67

173.   As a direct and proximate result of defendant's breach of duty of care, the Plaintiffs have been injured.

174.   As a direct and proximate result of the negligence of defendant and its officials, the Plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

175.   As a direct and proximate result of the negligence of defendant and its officials, the Plaintiffs suffered special damages and will require testing/medical monitoring.

176.   Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate the Plaintiffs for the negligence of the United States.

COUNT III: NUISANCE

177.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

178.   Plaintiffs are, or during some or all of the pertinent times were, in lawful possession of their properties on the Red Hill Navy water line, and used them, or had the right to use them, as residences or for other legitimate uses.

179.   The United States owned and materially controlled the Red Hill Bulk Fuel Storage Facility in close proximity to the Plaintiffs' properties and the water well that provided water to the Plaintiffs' properties.

68

180.   The United States is liable for the creating a condition at the Plaintiffs' residences that interfered with their right to use and enjoy those properties. The officers' conduct in operating the Red Hill Bulk Fuel Storage Facility thereby caused a nuisance to the Plaintiffs.

181.   The Plaintiffs' right to use and enjoy their properties has been impaired by the United States allowing fuel to leak from the Red Hill Bulk Fuel Storage Facility into its water well, contaminating the water delivered to the Plaintiffs' properties.

182.   The nuisance caused by the United States has substantially impaired the Plaintiffs' use and enjoyment of their property, has caused inconvenience, decreased quality of life, physical and mental discomfort, reasonable fear of disease, and adverse health effects.

183.   The United States has engaged in improper or negligent operation of the Red Hill Bulk Fuel Storage Facility, causing harm to the Plaintiffs.

184.   Defendant's conduct has been unreasonable. Reasonable persons, generally, looking at defendant's conduct, the problems caused by it, and by the nature of the harm to the Plaintiffs' properties and health, would consider defendant's conduct to be unreasonable.

185.   The invasions, harms, and injuries complained of herein by the Plaintiffs are substantial invasions, harms, and injuries to the Plaintiffs' health,

both physical and mental.

186.   The United States had full knowledge during some or all of the pertinent times when the Red Hill Bulk Fuel Storage Facility leaked fuel into the water supply and caused nuisance injury and harm to the Plaintiffs.

187.   The United States knew or should have known that leaking fuel into the water supply would invade the Plaintiffs' properties and substantially impair the Plaintiffs' health and use and enjoyment of their properties.

188.   While knowing that practicable technologies and methods are available to abate fuel leaks, defendant has failed to abate the causes of nuisance.

189.   Defendant's conduct described above constitutes a series of recurring abatable nuisance, which defendant has failed to remedy within a reasonable period of time, and for which defendant is liable.

190.   As a result of defendant's liability for recurring abatable nuisance, the Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT IV: MEDICAL NEGLIGENCE, FAILURE TO TREAT, DELAYED CARE

191.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

192.   Medical negligence claims under this count include but are not limited to the Plaintiffs listed in Attachment B.

193.   Each of these Plaintiffs sought medical care with Government medical providers.

194.   Each of these Government medical providers knew or reasonably should have known about the fuel leaks and the significant threat to public health they posed.

195.   Each of these military medical providers, through their training and protocols, possess an understanding of appropriate risk assessment and treatment for toxic exposure.

196.   Toxicological testing was not performed in a timely and proactive manner, nor was suitable treatment given, to ensure the health of each of these Plaintiffs after this known exposure event.

197.   The failure to properly treat Plaintiffs' physical conditions exacerbated their mental health conditions and their loss of trust in the Government.

198.   The United States has negligently failed to treat these Plaintiffs' medical conditions caused by the Red Hill Bulk Fuel Storage Facility fuel leaks.

199.   The United States has failed to monitor these Plaintiffs' conditions, perform required medical tests, or treat the illnesses caused by the negligent conduct relating to the Red Hill Bulk Fuel Storage Facility fuel leaks.

200.   The United States has failed to adhere to the accepted standards of

care for these Plaintiffs.

201.   The United States has failed to timely address the health conditions of each of these Plaintiffs or perform the standard of care in a timely manner, including appropriate referrals.

202.   In some instances, the United States has failed to treat these Plaintiffs altogether, refusing appropriate tests or treatment.

203.   The United States failed to clearly communicate the important facts regarding the Red Hill Bulk Fuel Storage Facility fuel leaks to these Plaintiffs or their medical care providers, allowing them to become ill, with no transparency in communicating the origin of the harm.

204.   Defendant's conduct described above constitutes a medical failure to treat or delay to treat medical conditions of these Plaintiffs, for which the United States is liable.

205.   As a result of defendant's liability for recurring abatable medical negligence and failure to treat, these Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

206.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

207.   By its acts and omissions, the United States caused fuel to leak into

the water system and injure residents, which thereby caused the Plaintiffs worry, anxiety, anguish, suffering, and grief.

208.   The United States knew that the Red Hill facility has a history of fuel leak water contamination, and that it was probable that additional leaks would occur and cause substantial damage if it did not act.

209.   The United States must now pay for the exact consequences that it knew would happen and for which it accepted the risk.

210.   Plaintiffs, as well as their children, spouses, and other occupants of their homes, have suffered, are suffering, and will continue to suffer because of the defendant's acts and omissions.

211.   Defendant's conduct was a substantial factor in causing the Plaintiffs' severe emotional distress.

212.   Plaintiffs have been damaged in an amount to be proven at the time of trial.

COUNT VI: PREMISES LIABILITY, DUTY TO CONTROL FORCE

213.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth here at length.

214.   The United States is the occupier, owner, and possessor of the following premises: the Red Hill Bulk Fuel Storage Facility, the water system, and the housing which Plaintiffs leased and resided upon. While generally, "a

landowner is not liable for injuries occurring after a lessee takes possession of the land," there are two well established exceptions:

215.   A lessor may be liable for a known but hidden condition. And a lessor may also be liable for nuisance emanations "that invade an individual's property from another location" and "interfere with an individual's right to use and enjoy land." *Mitchell v. United States*, No. 11-00088 HG-KSC, 2011 U.S. Dist. LEXIS 103409, at *18-21 (D. Haw. Sep. 9, 2011) (citing *Renz v. 33rd Dist. Agricultural Assn.*, 39 Cal. App. 4th 61, 46 Cal. Rptr. 2d 67 (Cal. Ct. App. 1995)).

216.   As an occupier, owner, and possessor of land, the United States has a duty to use reasonable care for the safety of all persons reasonably anticipated to be on the premises.

217.   By its acts and omissions, the United States failed to use reasonable care for the safety of persons reasonably anticipated to be on the premises it controlled.

218.   By its acts and omissions, the Government failed to warn of a known but latent hazardous condition.

219.   By its acts and omissions, the United States created a nuisance that invaded Plaintiffs' property and interfered with their right to use and enjoy the land.

220.   "[T]o prove [a] claim for premises liability under Hawai'i law,

74

[plaintiff] must prove by a preponderance of the evidence that a condition existed . . . which posed an unreasonable risk of harm, and that Defendant failed to take reasonable steps to eliminate that risk or to adequately warn visitors about it." *Paredes v. United States*, No. 19-00161 WRP, 2022 U.S. Dist. LEXIS 63535, at *18 (D. Haw. Feb. 24, 2022).

221.   A condition existed which posed an unreasonable risk of harm. The United States contaminated Plaintiffs' water system with fuel and other contaminants. That contamination was known to the Government but latent to others.

222.   The United States failed to take reasonable steps to eliminate that risk or to adequately warn residents about it. The Government failed to warn residents of the May 2021 leak altogether. And the Government waited *twelve days* to disclose that the contamination was caused by the release that occurred on November 20, 2021. And then, while the Government disclosed the presence of JP-5, the Government failed to disclose the presence of harmful additives like de-icing inhibitors.

223.   The United States knew or should have known of the hazard or defect that caused the injury.

224.   The United States was also in immediate control of a force—jet fuel at Red Hill Bulk Fuel Storage Facility and contaminated water in its drinking water

75

system—that it knew or had reason to know was in dangerous proximity to persons on the land that it possessed, including Plaintiffs.

225.   The United States failed to control the force to prevent it from doing harm to Plaintiffs.

226.   The United States failed to give a warning which was reasonably adequate to enable Plaintiffs to protect themselves. The Government could have avoided medical harm to the Plaintiffs had the Government disclosed the leaks and warned residents not to drink—or bathe in—contaminated water. The Government's own public health manuals required a "do not use" public notification when dealing with an unknown contaminant.

227.   As a direct and proximate result of defendant's breach of duty of care to those on its premises and in dangerous proximity to the force controlled by the United States, the Plaintiffs have been injured.

228.   As a direct and proximate result of the negligence of defendant and its officials, the Plaintiffs suffered substantial injuries and damages, including severe mental and emotional distress.

229.   As a direct and proximate result of the negligence of defendant and its officials, the Plaintiffs suffered special damages and will require testing/medical monitoring.

230.   Plaintiffs are entitled to actual damages in a fair and reasonable sum

in an amount to be determined at trial sufficient to compensate the Plaintiffs for the negligence of the United States.

231.  Defendant's conduct described above constitutes premises liability, for which the United States is liable.

232.  As a result of defendant's premises liability, the Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

CAUSATION

233.  But for the conduct of the federal officers at Red Hill, the plaintiff families would not have suffered inconvenience, illness, economic injury, and fear.

234.  As a general matter, the ingestion of jet fuel and its contaminants causes medical harm. Fuel is composed of toxic hydrocarbons that are highly dangerous to the human body. The Agency for Toxic Substances and Disease Registry (ATSDR) of the United States Department of Health and Human Services describes the long-lasting health effects of exposure to fuel chemicals. Such exposure can occur by breathing air in an area where an accident or leak of these jet fuels has occurred, touching contaminated soil, swimming in waters where jet fuels have been spilled, living near a hazardous waste site where jet fuels are disposed or, most directly, drinking such fuel.

235.  In the near-term, symptoms of such exposure regularly include headaches, fatigue, nausea, drowsiness, irritation of the throat and stomach,

difficulty breathing, fever, and vomiting. In the long term, permanent damage to the central nervous system can result, as well as pneumonia, cancer, decreased immune response, decreased neurological function, impaired hearing, and skin alteration. Drinking too much jet fuel can lead to unconsciousness and death. Affected organ systems include the respiratory tract, gastrointestinal tract, nervous system, liver, kidneys, reproductive system, and harm to a developing fetus— miscarriages have been reported. Benzene, just one of the chemicals the EPA identified as present in the Red Hill fuel, causes chronic conditions such as aplastic anemia, leukemia, and potentially multiple myeloma.[5]

236.   Specifically, each plaintiff has suffered inconvenience and life

---

[5] Benzene featured prominently as a substance present in another military water contamination case: the Camp Lejeune water contamination crisis. From the 1950s through the 1980s, people living or working at the U.S. Marine Corps Base Camp Lejeune, North Carolina, were exposed to drinking water contaminated with industrial solvents, including benzene. For those exposed to that contaminated water, the Department of Veterans Affairs now considers the following health conditions to be presumptively connected to their service:

- Adult leukemia
- Aplastic anemia and other myelodysplastic syndromes
- Bladder cancer
- Kidney cancer
- Liver cancer
- Multiple myeloma
- Non-Hodgkin's lymphoma
- Parkinson's disease

disruption, economic injury, illness, and fear and trauma.

237.   Each plaintiff is also at increased risk of future medical harm and will need medical monitoring for the associated long-term illnesses.

## NO EXCEPTIONS APPLY

238.   None of the Plaintiffs' claims asserted herein are subject to any of the exceptions to sovereign immunity found in 28 U.S.C § 2680.

239.   None of the negligent acts described herein were discretionary or subject to policy analysis.

240.   None of the acts or omissions described herein are protected by the misrepresentation exception.

241.   The United States, including the US Navy and its employees, failed to meet the required reporting obligations as described herein.

242.   The United States, including the US Navy and its employees, failed to exercise due care in the execution of its duties under the required report obligations described herein.

## JURISDICTION, VENUE & SERVICE

243.   This Federal District Court has federal-question jurisdiction because this action is brought pursuant to and in compliance with the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

244.   Venue is proper in this district pursuant to 28 U.S.C. § 1402(b)

79

because the United States is a defendant, and this is the judicial district where the acts or omissions complained of in this complaint occurred.

245. The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure. Service is affected by serving a copy of the Summons and Complaint on the United States Attorney for the District of Hawai'i by certified mail, return receipt requested at her office:

> United States Attorney's Office
> ATTN: Civil Process Clerk
> 300 Ala Moana Blvd # 6-100
> Honolulu, HI 96850

246. Service is also affected by serving a copy of the Summons and Complaint on Merrick Garland, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

## LIABILITY OF THE UNITED STATES

247. This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the Complaint

80

is made were proximately caused by the negligence, wrongful acts or omissions of representatives, employees, or agents of the United States of America working for the United States Department of the Navy, Army, or Defense, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

248.    Through the Federal Tort Claims Act, the United States has waived its sovereign immunity for the acts and omissions described here. *E.g.*, *Evans v. United States*, 876 F.3d 375, 380 (1st Cir. 2017), *cert. denied*, 139 S. Ct. 81 (2018).

249.    The defendant, the United States of America, through its agencies, at all times material to this lawsuit, owned and operated the Red Hill Bulk Fuel Facility and staffed its facilities and vehicles with its agents, servants, and employees.

CONDITIONS PRECEDENT

250.    Pursuant to 28 U.S.C. § 2675(a), all Plaintiffs timely presented their claims to the United States by submitting Forms SF-95 to the Office of the Judge Advocate General, Tort Claims Unit Norfolk, 9620 Maryland Avenue, Suite 205, Norfolk, Virginia 23511-2949, via electronic email: TortsClaimsUnit@us.navy.mil.. *See* Ex. 1 (Dec. 16, 2022 Forms SF-95), Ex. 2 (Jan. 10, 2023 Forms SF-95), Ex. 3 (Jan. 20, 2023 Forms SF-95), Ex. 4 (Feb. 10,

2023 Forms SF-95), Ex. 5 (Feb. 21, 2023 Forms SF-95), Ex. 6 (Mar. 6, 2023 Forms SF-95), Ex. 7 (Mar. 13, 2023 Forms SF-95), Ex. 8 (Mar. 15, 2023 Forms SF-95), Ex. 9 (Mar. 17, 2023 Forms SF-95), Ex. 10 (Mar. 31, 2023 Forms SF-95), Ex. 11 (Apr. 21, 2023 Forms SF-95), Ex. 12 (May 12, 2023 Forms SF-95), Ex. 13 (Jun. 20, 2023 Forms SF-95), Ex. 14 (Jul. 7, 2023 Forms SF-95), Ex. 15 (Jul. 14, 2023 Forms SF-95), Ex. 16 (Jul. 20, 2023 Forms SF-95), and Ex. 17 (Aug. 2, 2023 Forms SF-95).

251.    Receipt of all of the claims by the Department of the Navy was acknowledged by the Tort Claims Unit Norfolk, Office of the Judge Advocate General, Department of the Navy.

252.    As of February 3, 2024, more than six (6) months elapsed since all of the claims were presented to defendant and defendant has not made a final disposition of the Plaintiffs' claims. Accordingly, the claims of the Plaintiffs are deemed denied pursuant to 28 U.S.C. § 2675(a).

253.    Plaintiffs have exhausted their administrative remedies under the Federal Tort Claims Act and have fully complied with the statutory prerequisites for bringing this tort action against the United States.

DAMAGES

254.    As a result of the negligence of federal employees, agents, or representatives, the Plaintiffs have sustained damages and injuries including:

a.  Past and future physical pain and suffering;

b.  Past and future mental anguish and emotional distress;

c.  Past and future medical, healthcare, and attendant care expenses;

d.  Past and future lost income and of earning capacity;

e.  Past and future physical impairment;

f.  Past and future loss of enjoyment and quality of life;

g.  Past and future loss of enjoyment of property;

h.  Increased risk of future harm and medical monitoring for life;

i.  Loss of life expectancy;

j.  Nuisance damages, including inconvenience, illness, and fear;

k.  Out of pocket expenses;

l.  Loss of personal property;

m. Costs;

n.  Prejudgment and post-judgment interest as provided by law, at the maximum legal rate; and

o.  Such other and further relief to which the Plaintiffs may be justly entitled.

PRAYER

WHEREFORE, Plaintiffs pray that this Court:

a.  Award the Plaintiffs compensatory damages, in an amount to be

83

determined at trial;

b. Award the Plaintiffs pre-judgment and post-judgment interest and any other costs, expenses, or fees to which they may be entitled by law; and

c. Grant the Plaintiffs such other and further relief as this Court deems just and proper.

DATED:  Honolulu, Hawaiʻi, February 5, 2024.


*Lyle S. Hosoda*

/s/ Lyle S. Hosoda
LYLE S. HOSODA
KOURTNEY H. WONG
SPENCER J. LAU

/s/ Kristina S. Baehr
KRISTINA S. BAEHR
JAMES BAEHR
MARGARET M. NEUSEL

*/s/ Frederick C. Baker*
FREDERICK C. BAKER
JAMES W. LEDLIE
KRISTEN HERMIZ
CYNTHIA A. SOLOMON
SARA O. COUCH


*Attorneys for Plaintiffs*

84